##### IN THE

## SUPREME COURT OF JUDICATURE

##### OF THE

## STATE OF NEW-YORK,

#### IN JANUARY TERM, 1813, IN THE THIRTY-SEVENTH YEAR OF OUR INDEPENDENCE.

---

### ELLIOTT AND STEWART *against* ROSSELL AND LEWIS.

THIS was an action on the case. The cause was tried at the circuit court, in *St. Lawrence* county, on the 24th of *June*, 1812, before Mr. Justice *Thompson.*

The defendants were merchants residing at *Ogsdenburgh*, and owners of the schooner called the *Experiment*, and of scows, for the purpose of carrying goods and merchandise to, and from, the different ports and places on *Lake Ontario*, and *Ogdensburgh*, and *Montreal*. In *July*, 1810, the defendants issued the following public advertisement, or notice: "The subscribers inform the public, that they have formed a very extensive establishment at *Ogdensburgh*, for the purpose of pursuing the carrying business, from the different ports of *Lake Ontario* to *Montreal*. They have three substantial, well-built vessels, which will constantly ply on the lake, during the season, to convey produce to *Ogdens-burgh*, from whence it will be sent to *Montreal*, in *scows* and *batteaux.* They pledge themselves to employ the most faithful persons in the management of their boats and vessels ; and their per-

*Masters and owners of vessels, who undertake to carry goods for hire, are liable, as common carriers, whether the transportation be from port to port within the state, or beyond sea, at home or abroad; and they are answerable, as well by the marine law as by the common law of England, for all losses, not arising from inevitable accidents, or such as could not be foreseen or prevented.*

And whether the loss is to be attributed to that inevitable necessity, not arising from the intervention of men, and which no human prudence could have avoided, is a question of fact for a jury to decide.

ALBANY,
Jan. 1813.

ELLIOTT
v.
ROSSELL.

sonal attendance will likewise be given.  They will spare no expense or pains to render the transportation of property, by the way of *Ogdensburgh,* secure and cheap.  Vessels will depart, on an average of one a fortnight, from *Oswego, Sodus* and *Genesee* river.  They will also go to *Queenstown,* and the head of *Lake Ontario,* as required; and should the freighting demand an increased number of vessels, no time shall be lost in procuring them.  Property thus shipped, will be forwarded to *T. W. Storrow & Co.* their agents, at *Montreal,* who will do with it whatever may be required by the consignees.  The charge of transportation will be as follows :" (stating the rates of carriage :) " All articles not above enumerated, will pay freight in proportion to the above rates; and all produce going direct to *Montreal* will be exempt from all charges at *Ogdensburgh.*"

*C. Holmes,* the master of the *Experiment,* and in the service of the defendants, testified that he was employed by them, and sailed as their agent, and in making his contracts for freight, he was entirely governed by the advertisement above mentioned, which was put upon the main-mast of the vessel.  About the 10th of *October,* 1810, he applied to the plaintiffs, at the *Genesee* river, and offered to take a quantity of ashes for them to *Montreal,* at 2 dollars and 80 cents a barrel, free of expense at *Ogdensburgh;* and stated that he had scows ready, at *Ogdensburgh,* to forward the ashes to *Montreal;* and that he should proceed direct to *Ogdensburgh* without stopping at any other place.  *Lewis,* one of the defendants, was also at *Genesee* river at the time, and confirmed the contract made with the plaintiffs, who put on board of the schooner 57 barrels of ashes to be carried to *Montreal.*

The captain stated, that the loading was delayed 5 or 6 days, by the plaintiffs, and that he left *Genesee* river the 16th of *October.*  The schooner was delayed in her voyage by head winds, and forced to put into *Oswego.*  She arrived at *Ogdensburgh* about the 21st of *October.*  *Rossell,* the other defendant, objected to taking the ashes down to *Montreal,* on account of the lateness of the season; but *Stewart* urged their being sent, and assisted in loading them on board of the scow.

*Prosser,* the master of the scow, employed by the defendants to carry the ashes of the plaintiffs from *Ogdensburgh* to *Montreal,* was a witness for the defendants, and deposed, that *Stewart,* one of the plaintiffs, prevailed on him to take on board five barrels more than the witness thought it prudent or safe to take; and

ALBANY,
Jan. 1813.

ELLIOTT
v.
ROSSELL.

when he objected, as the scow could not be taken into *Chateau-gey* river, through which it is absolutely necessary to pass, in order to arrive at *Montreal*, *Stewart* answered, " it is nothing to you, the property is mine, and if you have to take out part of the load, it is to be at my expense." After the 5 barrels were on board, *Stewart* urged the witness to take 10 or 12 barrels more, and was displeased at his refusal. He stated that the scow was lost by splitting on a rock, on the shoals, within sight of *Montreal*. He took a pilot at *Chateaugey*, whom he was informed was a good pilot. They passed safely over the *La Chine* rapids, and the scow was proceeding, with a strong current, in a channel, which the witness, from long experience, knew to be the right channel, when a sudden gust of wind arose, and drove the scow out of the right course, and the pilot called out that they were getting out of the channel, and urged all hands to row, as hard as possible, to regain the right channel; that the witness, and all hands accordingly rowed, to the utmost exertion of their strength, but in vain, as the scow was driven on the rock above mentioned, and was lost; that there were six able-bodied boatmen, which were as many as the pilot required, or as ever go in such a boat. The rock is about a mile from *Montreal*, in a southerly direction, and out of the usual channel for scows, on their way to that place. That the scow was about a mile from the rock, when the pilot ordered the men to row; and they continued to row, with the greatest exertion, for half an hour before the scow struck. That if the scow had been left to the winds and current, it would have been driven on the rocks and shoals, above the place where she struck. The scow was lightened of three boat loads, before passing *Chateaugey* river, so as to satisfy the pilot.

Two of the boatmen, also, deposed to the same facts; and that the boat was driven out of the right channel, by a sudden squall or gust of wind, and that they did not believe it possible, under the circumstances, to avoid striking the rock.

It was proved that the pilot was regularly licensed, and was a person of experience, skill and integrity, and a good pilot. The master, in his *protest*, at *Montreal*, stated, that on the 7th of *November*, between 10 and 12 o'clock in the forenoon, the scow " unfortunately struck upon a rock, in the *Montreal* rapids, and instantly bilged, by which accident she was totally wrecked with her cargo."

A witness for the plaintiffs, testified, that he was standing on

the dock, at *Montreal*, about a mile from the scow, at the time she struck, when she immediately went to pieces. He saw her about half an hour before. The weather was fair, the sky clear, and there was no breeze where he was. He saw *Prosser*, the master, about half an hour after he got ashore, who said he supposed they were safe until the pilot called out; that the pilot attempted to go to the right of the rock, and finding he could not, endeavoured to go to the left, and did not discover the rock soon enough to avoid it. The scow had no sails up, and the master made no mention of any gust of wind; that the day was pleasant, and a steady south-east breeze had been blowing in the morning.

Another witness also said, that he was in *Montreal*, at the time, and was on the dock, and saw the scow strike the rock. That there was a moderate breeze from the south-east, and he did not perceive any gust of wind, though there might have been a flaw of wind without his seeing it.

The judge charged the jury, that the agreement entered into by the agent of the defendants, and afterwards assented to by them, placed them in the situation of *common carriers*, and subjected them to all the legal liabilities attached to such character; and that the evidence did not, in his opinion, warrant the conclusion that the original contract was altered, or the responsibility of the defendants changed; and, if not, the only ground on which the defendants could be exonerated, would be, that the loss was occasioned by the *act of God*. That the cause of the loss was a fact for the jury to determine, and he left the fact for their decision, with an opinion, that the loss was not owing to the act of *God*, within the true meaning of the rule of law on the subject.

The jury found a verdict for the plaintiffs, for 1,968 dollars and 78 cents, being the value of the ashes at *Montreal*, after deducting the freight.

A motion was made to set aside the verdict, and for a new trial; 1. For the misdirection of the judge; 2. Because the verdict was against evidence.

*Storrs*, for the defendants, contended, that the defendants being carriers to a *foreign* port, beyond the jurisdiction of the state, and the loss having happened without such jurisdiction, their liability must depend on the *marine law*, which excuses the owners or carriers, for all losses, happening by the *act of God, public enemies*, or the *perils of the sea*, that is, the dangers intrinsically at-

tending the navigation, and arising from natural causes. All losses by other causes must be imputed to *negligence.* A common carrier, at *common law,* according to the *English* books, is a carrier, by land, or by water, within the jurisdiction of the realm of *England,* and ljable, by the *custom of England,* for all losses, except such as happen by the act of *God,* or public enemies. This definition includes all vessels navigating, coastwise, from port to port, within the realm. No adjudged case is to be found, which decides that a contract for the carriage of goods by water, beyond the jurisdiction of the realm, subjects the shipowners to all the liabilities attached to the character of common carriers within the realm.

In the case of *Morse* v. *Slue,*[*] cited in *Coggs* v. *Bernard,*[†] it was decided only, that a shipowner is liable for a loss by robbery happening while the ship is in port. And all the cases[‡] which may be cited, will be found to be those where the transportation was from one place to another, within the realm or jurisdiction of the state.

The exemption of carriers by water beyond the realm or jurisdiction of the state, from responsibility for losses, happening by perils of the sea, rests on the general doctrine of the marine law, and not on the bill of lading or contract in which it is usually inserted.

This distinction, as to the liability of shipowners, or carriers, without the realm, is recognised by *Marshall,* in his *Treatise on Insurance,*[§] and by Lord *Mansfield,* in the cases of *Forward* v. *Pittard,*[¶] and in *Hotham* v. *The East-India Company.*[**]

In *Bacon*[††] it is laid down, that though by the *admiralty law* the master is not chargeable *pro damno fatali,* as in case of pirates, storms, &c. where there is no negligence in him; yet, because the ship was *infra corpus comitatus,* the case was not to be measured by the rules of that law. So *Molloy*[‡‡] says, the "master must see all things forthcoming, which are delivered to him, let what will happen; the act of *God,* or an enemy, *perils and dangers of the sea only excepted.*" In all the books, the liability of the *master* or owner is put on the ground of *negligence.* *Abbott*[§§] says, "if a ship perish in consequence of striking against a rock or shallow, the circumstances under which the event takes place must be ascertained, in order to decide whether it happen by a peril of the sea, or by the fault of the master," &c. He places

ALBANY,
Jan. 1813.

ELLIOTT
v.
ROSSELL.

[*] T. Raym. 220.
[†] Ld. Raym. 918.
[‡] Nesbitt v. Lackington, Marsh. Ins. 158. Dale v. Hall, 1 Wils. 381. Smith v. Shepherd, Com. on Cont. 323. Goff v. Clinkard, 1 Wils. 282. n. Schieffelin v. Harvey, 6 Johns Rep. 175. Colt v. M'Mechan 6 Johns. Rep. 166
[§] Marsh. on Ins. b. 1. c. 7. s. 4.
[¶] 1 Term Rep. 27.
[**] Doug. 178.
[††] Bac. Abr. tit. Carriers, (B), and note. See also 15 Vin. Abr. 344. Master of Ship, B. 12.
[‡‡] Molloy, b. 2. c. 2. s. 2.
[§§] Abbott on Shipp. &c. part 3. c. 4. s. 6.

ALBANY,
Jan. 1813.

ELLIOTT
v.
ROSSELL.

the liability of the master wholly on the ground of fraud or negligence, in the management of the vessel.

By the opinion delivered by the judge, the jury were precluded from inquiring whether the loss was owing to the intrinsic perils of the navigation, or to the negligence of the master or persons employed by the defendants.

*Kirkland,* contra, insisted, that the defendants were to be considered as common carriers,[*] from the very terms of their advertisement or notice to the public, and their application to the plaintiffs. Owners and masters of vessels, carrying goods for hire, on the high seas, or navigable rivers, are deemed common carriers, and are answerable against all events, except the acts of *God*, and the public enemies,[†] unless there is some further exception in the contract for the carriage. Carriers by water are liable for goods committed to them, as common carriers, whether their transportation is from port to port, in the same state or kingdom, or from one state or kingdom to another, unless, in the contract for the carriage of the goods, there is some clause taking away the liability created by the general rule of law.

In none of the cases decided has it occurred to the counsel who argued, to make the distinction now contended for by the defendants' counsel.[‡]

It would be strange if a person undertaking to transport goods across the *St. Lawrence,* should be answerable, as a common carrier, for a loss of the goods, happening without his fault, at a certain distance from the shore, and for a similar accident, he should be excused, because he had passed the middle of the river, when it happened.

The cases of *Forward* v. *Pittard,* and *Hotham* v. *East-India Company,* do not support such a distinction. The former was the case of a common carrier. The latter arose on a chart.er-party. Nor does *Abbott* countenance the distinction now attempted to be made. He gives the form of a bill of lading[§] containing exceptions, to exempt the owner and master from liability in certain cases, in which they would otherwise have been liable. If they would have been excused by the general rule of law, where was the necessity of adding the clause, "and all and every other dangers, and accidents of the seas, rivers, and navigation, of whatever nature or kind soever, excepted." In another place,[¶] he lays down the doctrine in these words: "Masters and owners, *like other*

[*] *T. Raym.* 220. 1 *Wils.* 381. 5 *East,* 428. 1 *Wils.* 282. *Abbott,* 249. 1 *Salk.* 18.

[†] 1 *Roll. Abr.* 2—6. 4 *Co.* 84. 2 *Ld. Raym.* 918. 1 *Term Rep.* 27. *Jones on Bailment,* 103, 104. 5 *Term Rep.* 389. 1 *Salk.* 143. 6 *Johns. Rep.* 160. 1 *Com. Dig.* tit. *Carrier,* C. 1. 299. 3 *Esp. Rep.* 127.

[‡] 1 *Wils.* 282. 8 *Johns. Rep.* 213. 6 *Johns. Rep.* 170. 3 *Caines' Rep.* 217.

[§] *Abbott,* part 3. c. 2. s. 3.

[¶] *Abbott,* part 3. c. 4. s. 1.

*common carriers*, are sometimes answerable, though no blame is imputable to them; for in considering whether they or other carriers are chargeable for any particular loss, the question is not whether the loss happened by reason of the negligence of the persons employed in the conveyance of the goods, but whether it was occasioned by any of those causes, which either, according to the general rules of law, or the particular contract of the parties, afford an excuse for the non-performance of the contract." No distinction is suggested between a carriage from port to port, in the same state, or between different states or kingdoms, or whether the loss happened at home or abroad.

KENT, Ch. J. The defendants move for a new trial on the following grounds:

1. Because the judge ruled that the contract placed the defendants in the character of common carriers.

2. Because he ruled that the testimony, as to what happened at *Ogdensburgh*, did not change their responsibility.

3. Because the verdict was against evidence.

1. The defendants, by their advertisement, undertook the carrying business, or the transportation of property for hire, from the ports of *Lake Ontario* to *Montreal*, by carrying the same in vessels from the ports of the lake to *Ogdensburgh*, and in scows and batteaux, from thence to *Montreal*, and they promised to perform the same with fidelity and safety. In pursuance of this general undertaking, Captain *Holmes*, in the employment of the defendants, took the ashes on board of his sloop and brought them to *Ogdensburgh*, where they were embarked on board of their boat, under the care of Captain *Prosser* for *Montreal;* and all this was done with the knowledge and assent of the defendants. They were, therefore, common carriers, in the sense of the law, and liable to all the duties and responsibilities attached to that character.

It has long been settled that a common carrier warrants the safe delivery of goods, in all but the excepted cases of the act of God and public enemies; and there is no distinction between a carrier by land and a carrier by water. Masters and owners of vessels are liable, as common carriers, on the high seas, as well as in port; and the argument of the ingenious counsel for the defendants, is not well supported in the position, that this doctrine of common carriers is, by the common law of *England*, to be confined to cases of transportation by water, *within the jurisdiction of*

*the realm,* and that it does not apply to losses arising out of the state. All the books and all the cases which touch this subject, lay down the rule *generally,* and apply it as well to shipments to or from a foreign port, as to internal commerce. In the case of *Morse* v. *Slue,* (*T. Raym.* 220. 1 *Vent.* 238. 290. 1 *Mod.* 85. S. C. 2 *Lev.* 69.) the defendant was charged as a common carrier, under the custom of the realm, and that by the custom, those who undertake to carry goods *beyond sea,* were bound to keep them safe, and that the goods in that case were delivered on board the ship of which the defendant was master, to be transported for a reasonable reward, to *Cadiz* in *Spain.* Lord *Holt,* who was one of the counsel who argued the cause on the part of the plaintiff, said that the declaration was drawn by one of the best special pleaders of the time. The judgment of the court, in favour of the plaintiff, was delivered by Sir *Matthew Hale,* who declared that the master was liable, in consequence of the reward which he or the owners received as freight, and that he was liable as a common carrier, for it was admitted that there was not the least negligence. Though the goods were lost by robbery on board the vessel in the river *Thames,* before the voyage had commenced, yet the court did not proceed on the ground that the master was responsible under one law, in port, and under another, at sea. The court said, the case was to be decided by the rules of the common law, and not of the admiralty law, and that there was no difference between this case and that of a common carrier. If the master be chargeable as a common carrier, for goods received to be transported beyond sea, it would seem to be very extraordinary and idle for the law to regard him in that character only from the time that the goods were received on board, until he had put to sea, and to regard him when coming from abroad, as common carrier only from the time that he entered within the jurisdiction of the port. There is no colour of such a limitation of the rule. The character, duty and responsibility of a carrier continue to attach to the master, as long as he has charge of the goods. *Molloy,* who was counsel with *Holt* in the above cause, cites the above case (b. 2. c. 2. s. 2.) to prove that, by the common law, the master is answerable "if the goods be lost or purloined, or sustain any damage, hurt or loss, whether in the haven or port before, or *upon the seas after, she is on her voyage.*" If there be any exception as to this responsibility at sea, it proceeds from the special provision in the charter-party, or bill of lading, and not from any suspension of the

ALBANY,
Jan. 1813.

ELLIOTT
v.
ROSSELL.

rule. The exception of the perils of the sea is not to be found in the forms of a charter-party, or bill of lading, as given by *West* under *Elizabeth; (West's Symb.* part 1. s. 655, 656. 659.) but we find it afterwards in the charter-party in the time of *Charles* I. (*Pickering* v. *Barkley, Sty.* 132.) and the exception has lately been extended to almost every kind of accident. (*Abbott,* part 3. c. 2. s. 8.) There is, likewise, a recent *British* statute (26 *Geo.* III.) restraining the general responsibility of shipowners. These exceptions are strong evidence of the acknowledged law which rendered them necessary. In short, it must be regarded as a settled point in the *English* law, that masters and owners of vessels are liable in port, and at sea, and abroad, to the whole extent of inland carriers, except so far as they are exempted by the exceptions in the contract of charter-party, or bill of lading, or by statute. (*Rich* v. *Kneeland, Cro. Jac.* 330. *Goff* v. *Clinkard,* 1 *Wils.* 282. note. *Smith* v. *Shepherd,* cited in 2 *Com. on Cont.* 323. *Buller* v. *Fisher,* 3 *Esp. N. P.* 67. *Bever* v. *Tomlinson, East,* 36. *Geo.* III. cited in *Abbott,* part 3. c. 4. s. 4.)

It would be of no avail, if the counsel for the defendants could succeed in taking this case out of the operation of the *custom of the realm,* and placing it under the marine law. That law is essentially the same, and holds an equally strict control over the master; and upon the same principle of public policy, a master of a vessel, or common carrier, by the almost universal law of nations, as well as by the common law of *England,* is chargeable for all losses not arising from inevitable accident. If, therefore, according to *Roccus,* a theft be committed on board, the master is answerable like an innkeeper, though the loss happen without his fault. So if the ship *strike on a shoal, unless it be by the violence of winds or storms,* he is liable, because he did not provide against an accident which a careful navigator would have foreseen. So he is liable if he does not conduct the voyage with a due regard to the circumstances of the ship, time and place, and the practice of skilful navigators. (*Roccus,* n. 40. 55, 56.) *Emerigon* (tom. 1. 373. 377.) says, it is so difficult to discover the faults of a master of a vessel, that he is held responsible for very slight negligence. He is in fault, if he has not foreseen what he ought to have foreseen, with due diligence. In short, he says, the master, in consequence of his compensation, is answerable for all damage which the cargo receives, unless it proceeds from an ac-

cident which he could not foresee or prevent. *Valin* declares expressly, (tom. 2. 394.) that nothing but the *cas fortuit* will excuse the master of a ship from responsibility for a loss. The rule applies, in the *French* code, equally to carriers by land and by water. We must, therefore, conclude, that there is nothing peculiar on this subject in what is termed, in the *English* law, *the custom of the realm;* for the marine law lays down the rule against carriers with essentially the same strictness or severity of sanction.

The *civil* law, the source, in this instance, of the marine law, was equally guarded, and placed masters of vessels and innkeepers under the like responsibility. They were held liable, under an edict of the *Prætor*, for every loss happening without their fault, that did not happen *damno fatali*, or, as *Voet* expresses it in his *Commentaries, excepto eo solo, quod damno fatali aut vi majore, veluti naufragio aut piratarum injuria, perisse constat;* and he says that, except as to the penalty, the rigour of the rule continues to this day in the *Dutch* jurisprudence. (*Dig.* 4. 9. s. 1. and 3. *Dig.* 47. 5. s. 1. and 3. *Voet's Commentaries*, h. t.) The reason given in the civil law, for the rule, is, that it was necessary to confide largely in the honesty of these people, and to give great opportunities to commit frauds which it would be impossible to trace. And this strict rule has no doubt been as generally adopted, and as widely diffused, as the *Roman* law. *Erskine* (*Institutes*, 452. pl. 28, 29.) says, that the edict of the *Prætor* is, with some variations, adopted into the law of *Scotland*. Indeed, we find the rule stated in precisely the same terms, in the ancient usages of a country into which we do not know that the *Roman* law ever penetrated. " If a load be damaged by a carrier's fault, whatever is lost he shall be compelled to make good, unless the injury happen by the act of God, or of the king, and whatever does not so happen denotes a fault." (*Colebrooke's Digest of Hindu law*, vol. 2. 372. 374.)

The courts in this country have always considered masters of vessels liable as common carriers, in respect to foreign as well as internal voyages. In *M'Clure* v. *Hammond*, (1 *Bay's Rep.* 99.) the defendant undertook to bring a quantity of tobacco for the plaintiff, from *Augusta*, in *Georgia*, to *Charleston*, and the vessel was driven ashore on the coast, during the voyage ; and as the loss did not appear to have arisen from inevitable accident, he was held liable as a common carrier. So in *Bell* v. *Reed and another*, (4 *Binn. Rep.* 127.) the defendants were considered liable as com-

mon carriers, for goods lost on a voyage from *Fort Erie*, in *Upper Canada*, to *Pennsylvania*, though the loss happened on the *Canadian* shore. It was a conceded point that the common law doctrine applied to the case. The cases decided in this court, of *Schieffelin* v. *Harvey*, (6 *Johns. Rep.* 170.) and of *Watkinson* v. *Laughton*, (8 *Johns. Rep.* 213.) have proceeded upon the principle, that the master of a ship is liable as a common carrier, for an embezzlement happening in the course of a foreign voyage.

2. There was not any act done or new contract between the parties at *Ogdensburgh*, which prevented the application of this rule. The only circumstance that occurred there, was a reluctance expressed by Captain *Prosser* to load the scow to the extent that the plaintiffs wished, and a reluctance in the defendants to carry ashes to *Montreal*, at so late a time in the year. But still the undertaking went on, without any new contract, or any understanding whatever between the parties, to vary or lessen the general nature or effect of the engagement.

3. The only real point in the case was a question of fact submitted to the jury, viz. whether the loss of the scow was to be attributed to that inevitable necessity, not arising from the intervention of man, which human prudence could not have avoided, and which is considered in law as the act of God. There was contradictory testimony upon this point, but we think, with the judge who tried the cause, that the weight of evidence was in favour of the conclusion drawn by the jury, and that the loss did not arise from any sudden gust of wind; but from the want of due care and skill in steering the boat down a well known and dangerous rapid. The dangers of such a rapid were at the risk of the common carrier, as much as the dangers of a broken and precipitous road. The loss must have arisen from some extraordinary occurrence, as winds, storms, lightnings, &c. to bring the carrier within the exception.

*Per totam Curiam.*

Motion denied.