Tilghman C. J. —
Several exceptions were taken to the .Court’s opinion on points of evidence during the trial of this cause, and an exception, was also taken to the charge delivered to the jury.
1. The first exception was to the opinion of the Court on the rejection of the deposition of Joseph Woods, offered in evidence by the defendants. This deposition had been regularly taken by the plaintiff, under a rule of Court, but was not offered in evidence by the plaintiff, neither was the witness subpcenaed -by either; party, although he lived in the county of Allegheny, There is a rule of Court, forbidding the reading of a deposition, if the witness lives within forty *549 miles of the Court, unless sick or unable to attend. The. defendants’ counsel contended, that the deposition was evidence for the defendants, although there was no proof that the witness was sick or unable to attend, and although it certainly would not have been evidence for the plaintiff under the same circumstances. I do not perceive the force of this distinction between plaintiff and defendant. ■ When the deposition is taken, it ought to be filed. It is not the property of the party on whose behalf it was taken, nor has be any right to withhold it. But it often happens, that the party, at whose instance it was taken, finds himself mistaken, and the testimony proves to be unfavourable to him. In such case, the adverse party has a right to make use of it, subject nevertheless to the rule of the Court, which forbids the reading of it, if the witness lives beyond a certain distance, unless the .Court be satisfied that due diligence has been used to procure his attendance. This is a good rule; because the truth cannot be so completely elicited by a deposition, as by a viva voce examination. The defendants say, that it was the business of the plaintiff to subpoena his own witness,,and therefore they did not do it. But in this they were wrong. The plaintiff might not like the evidence, and if he did not, he was under no obligation to summon the witness. If the defendant thought this testimony favourable to himself, it was his business to secure it, by taking out a subpoena for the witness, and endeavouring to procure his personal attendance. If he had appeared, the plaintiff would have had the benefit-of asking questions which may have been very material; and of which he would be deprived, if the deposition were to be admitted in evidence. I am of opinion, therefore, that the^decision of the Court was right.
2. The second exception was to the rejection of a paper purporting to be the protest of the captain and several of the men employed by him to navigate the boat, reduced to writing the day after the accident happened. It .was alleged by the defendants, that several of the men who joined in the protest, had gone out' of the State, to places, unknown, and it was their evidence only which was offered. There are'many objections to this kind of evidence, I never approved of it, and have been induced to consent to its admission, solely in compliance with the practice which had been established long *550 before I had a seat on this bench, and which I did not think myself at. liberty to contradict. But as this practice is peculiar to Pennsylvania, and in my opinion, productive of more harm than good, I cannot consent to its extension beyond its ancient bounds. I have examined all the cases decided in our Courts, and find none in which a protest has been admitted, except in maritime voyages. . The reasons which induced their admission in those cases, do not apply to inland navigation in general. It is true, that in some instances, the voyages from Pittsburg down the Ohio and Mississippi are long, but in others they are short; and there is not, in general, that difficulty in procuring the testimony of the witnesses which occurs in voyages by sea. But be that as it may, we have no practice calling for. the admission of a protest in cases of inland navigation, and therefore considering such evidence as .contrary to general principles, and not well calculated for investigating, the truth, I am opposed to it. In this point, therefore, I concur in opinion with the Court of Common Pleas, who rejected the evidence.
3. The third exception was to the rejection of evidence, offered by the defendants, of the custom or usage which had prevailed at Pittsburg, and in the western country in general, touching the liability of those persons who carried the goods of others for hire, on the waters of the Ohio and Mississippi. The object of the defendants was, to prove a custom, by which' the carriers were liable for losses, only .in case of negligence. The Court rejected the evidence, ■ because in this case there was a written contract; but they were willing to admit, and did admit, evidence of usage or custom, ascertaining the construction of the Words,. “ inevitable dangers of thé river f which had been introduced into this bill of lading.
If the case had rested solely on the written contract, there would have been much to say in favour of the decision of the Court, because, be the common law what it may, the parties have a right to alter or modify it by special contract, and when they have done so, the question is, what is the construction of the contract ? In mercantile cases, the usage of trade is.often called in, to explain words of doubtful import, although it would not be admitted to contradict the intent of-the contract, expressed so clearly as to admit, of no doubt *551 Where evidence of usage is admitted, the witnesses are eon-fined to the fact of usage, and are not allowed to give their opinion. This is the law, established by the best authority. 1 refer to the following cases. Abbott, Part 3, ch. 4, sec. 2. 2 Marsh. 207 (note.) Winthorp v. The Union Insurance Company, C. C. U. S. P. April Term, 1807. Ruan v. Gardner, 2 Marsh. 708 (note.) C. C. U. S. P. October Term, 1804. Frith v. Barker, 2 Johns. 327. 2 Marsh. 208 (note.) That the Court was right, in admitting evidence of usage, to ascertain the construction of the written contract, in the present case, I am clear. “ The unavoidable dangers of the river” are not more definite expressions than “ the perils of the sea,” the words usually inserted in bills of. lading on maritime voyages. And in such bills of lading, evidence of usage has been received. So long ago as the twenty-fourth year of Charles I. (King of England,) a question.arose, in the case of Pickering v. Barkley, 1 Styl. 132, whether a taking by pirates was a peril of the sea. The case came before the Court on a demurrer. Merchants and experienced mariners were examined, from whose evidence the Court was satisfied, that the taking was generally understood to be within the words of the contract, and decided accordingly. But on the hearing of the trial of the case before us, it probably escaped the Court, that the question was not confined to the written contract, because there was a count in the declaration, in which the defendants were charged as common carriers. If the plaintiff had failed in his count on the special contract, he might have recovered against the defendants as common carriers. It was incumbent on the defendants, therefore, to satisfy the Court and jury, that they were not liable as common carriers ; and this they could not do, but by shewing that the strict common law rule had not been received in the western country. Strict indeed is the rule of the common law. For the carrier is liable for every accident not arising from the act of God or a public enemy. It was not always so. Until England became a commercial country, the law of carriers was conformable to the general principles of bailment; that is to say, the carrier was liable,only, where he had not used ordinary care and vigilance. It was so understood in the reign of Henry VIII. Jones on Bailments, 102, 103, But when commerce became extend *552 ed, under the flourishing reign of Elizabeth, it was thought expedient to adopt a stricter rule, in order to guard against frauds and collusions, easily practised, but hard to prove. In England, the rule' has been rigidly observed, for the sake of maintaining what the Courts have considered as a public convenience, though not without, now and then, a struggle, in cases of'extreme hardship on the carrier, where the loss has been by fire or robbery. The law, as held by modern Judges, will be found in 1 T. Rep. 27, Forward v. Pittard; 5 T. Rep. 389, Hyde v. The Trent and Mersey Navigation Company; and 10 Johns. 9, Elliott v. Rossell. But, although the Courts have not relaxed, yet the rule has been considered by the public as more severe, in some instances, against carriers by water, than was consistent with justice. And accordingly, about the year 1795, the usual form of charter-party was altered in England, and now stands as follows : “ The act of God, the King's enemies, fire, and all and every other dangers and accidents of the seas, rivers, and navigation, of whatever nature and kind soever, excepted.” The parliament has also interfered in favour of carriers by water. For by Stat. 26 Geo. III. ch. 86, (Abbott, Part 3, ch. 4, sec. 8,) they are relieved from liability, in case of fire on board any ship or vessel; neither are they liable for “-gold, silver, diamonds, watches, or precious stones, lost in a ship or vessel, by robbery, embi zzlement, making away with, or secreting, unless inserted in the bill of lading, or notice given in writing, stating the articles and their value.” An attempt was afterwards made to cariy the thing farther, and to reduce the liability of carriers by water, to losses which happened through the fault or negligence of the master or mariners. A bill to this effect passed the House of Commons, but was rejected by the Lords. (See Abbott, Part 3, ch. 4, sec. 1 (note.) This sketch of the English law will be found important, when we come to consider the propriety of admitting evidence of the custom of the western country. With regard to carriers by land, the law has been here, as in England. Public convenience requires it, nor have I heard a suggestion of any doubt on the subject. But with regard to carriers by water, the law has not been considered as settled. There is said, indeed, to have been a decision at Nisi Prius by Chief Justice McKean and Judge Yeates, *553 that carriers on the river Susquehanna were liable as common carriers. But we have no report of that case, and it probably was decided without much argument or consideration. The point came before this Court in Dean v. Swoop, 2 Binn. 72. The Court perceived its importance, and declined giving an opinion on it, as it was unnecessary, the cause admitting of a decision on another point. The.navigation of the Susquehanna and the western waters is quite a new thing. Its origin may be dated posterior to our independence. Prior to that, it did not deserve the name of navigation, nor could there have been any custom about it. Many parts of the English common law have been rejected, as improper for the condition of this Commonwealth. To what extent that common law has been reserved, in the navigation of our rivers, is, in my opinion, fairly open to investigation. It is to be understood, however, that it lies upon him who sets up an usage departing from the common law, to prove it, to the entire satisfaction of the Court and jury. It was remarked by this Court, in the case of Carson v. Blazer, 2 Binn. 475, that our rivers were so differenc from those of England, that the same laws, respecting the property of the Fisheries, would not suit the two countries, nor had the English law on that subject been received in Pennsylvania. I will not say, that the English law of carriers by wa-. ter, is inapplicable to this country ; but whether it has been adopted in its full extent, is a fact worthy of investigation. Unless a custom, or usage, is most clearly established to the contrary, I should think that the carrier was liable for every accident which skill, care, and diligence could have prevented. What may be called the act of God, has sometimes occasioned difference of sentiment. But the best opinion is, that the act of God is something in which the act of man has no part, such as lightning, tempest, wind, ,&c. In our rivers, which are interspersed with falls and rapids, a sudden flaw, not amounting to storm or tempest, might have such an effect, as to defeat , all human skill and diligence, and should be considered as the act of God. There is great reason, why the carrier should be liable for all kinds of embezzlement, stealing, and robbery, except by the public enemy. For in those cases, collusion may be so artfully concealed, that it would be almost impossible to. detect it. But we, *554 need not take such large ground for the decision of the question before us, which is, whether on the count against, the defendants, as common carriers, they might not be permitted to prove an usage different from the common law ? And for the reasons already given, as well as many others which, might be given, I am well satisfied that the evidence was admissible, On the written contract, it would be premature to make any remarks, because the Court admitted evidence of usage to explain its construction, and there is no question on that point before.us.
I will now consider the exception to the charge, which is, that the Court took from the jury the decision of matters of fact. The charge contains many sensible and pertinent observations both on the law and the evidence; and submits the case to the jury, in a manner very favourable to the defendants. But it is objected, that, in some parts, the opinion upon facts was so decided, as might induce the jury to think, that they were bound to follow it. It is difficult for a Judge who delivers a long charge, to repeat, every time he gives his opinion on facts, that the jury are not bound by it. There is no doubt about the principle of law. If the Judge assumes the decision of the fact, to the exclusion of the jury, it is error. But it is not error, to express his own opinion, still submitting the matter to the jury, even though his opinion should not be warranted by the evidence. But in the application of this rule, there is sometimes difficulty, as will appear by,the cases cited by the defendants*' counsel, — Burd v. Dansdale, Small v. Wright, and Sampson v. Sampson. I can say, with certainty, that this Court never had the least difference of opinion as to the principle. And as to the cases cited, I think they are all in conformity to that principle, when submitted to the test of close examination. As this cause must be reversed on other grounds, and the learned President will have an opportunity of removing all cavil on the’ point, by stating distinctly to the jury, what are the subjects for their decision, I think it unnecessary to say more on this part of the case. On the whole, I am of opinion, that the-judgment should be reversed, and a venire facias de novo awarded.
Gibson J. —
Depositions under a rule of Court are unlike *555 depositions in Chancery, which are taken by officers appointed by the Court, and published in the cause before the hearing. These may be read in an action at common law be-' tween the same parties, because they- were actually in evidence in the cause in Chancery, as1 soon as they had passed publication ; and although I ‘have found no case in which a deposition in Chancery has been admitted at law, against the party who had the witness examined, no doubt it might be done where the witness is dead, for the reason, that what a deceased witness has sworn in another cause between the same parties, is evidence for either, without regard to the party by whom he was called. Evidence actually received must necessarily belong equally to both parties; and it is by viewing a deposition in this light, from the time it is taken, that doubt arises : whereas, it is evident, our examination is provisional — something like a de bene esse examination in Chancery — and until the deposition is actually admitted, T cannot see on what ground it is to be considered as the common property of both parties. It is a measure of precaution taken by the one, at his own trouble and expense, and is adverse to the other, who certainly has no right to participate in the benefit. He could have examined the witness for himself; and might just as well claim a continuance on account, of the absence of a witness on the adverse part, because he depended on his adversary to procure his attendance. He has no right to calculate the chances of the latter taking a particular course ; and if he does so, it ought to be at his own risk. Bqt beside the abstract injustice of the thing, substantial injury would be done by permitting a deposition to be introduced against the consent of him who had it taken. Before the magistrate, the witness is considered and treated as the witness of the party who examines him : at the trial, he is necessarily the witness of the party who reads his deposition. The case then would present the strange spectacle of a party offering his own witness with the benefit of a cross examination, which is denied to the party against whom he is offered. The latter may have declined to use the deposition, because, not having been allowed to put leading questions, he was unable to bring out the only fact for which the testimony of the witness was desirable. This is not all: he has conducted the examination *556 with a view only to particular facts; in the course of which, other facts, which he is not apprised of as being considered important by the other side, are spoken of in a way that he afterwards finds prejudicial to him. Now as to these, he is led into a surprise which he would have avoided, if his attention had been led to them by a direct examination from the other side. The examining part), from nis situation, necessarily labours under a serious disadvantage ; especially, where the witness is biassed against him. No counsel will deny the immense value of a cross examination ; or that he has not often beheld the truth wrung by it from an unwilling witness against his utmost power of retention. Where the witness is evidently hostile, the Court will exercise a discretion in permitting the party who calls him to put direct questions with all the latitude of a cross examination : a magistrate has no discretion; nor could the Court, who look only’ at the face of the deposition, judge whether he had exercised it properly, if he had ; and it is a good objection, where nothing appears to justify it, that the examining party has put a leading question. Before an examiner in Chancery, or a special commissioner, he has all the advantage of an examination in Court; for if there has been any thing improper during the examination, the deposition will be suppressed, and the witness, in some cases, be examined even at bar; but we know how miserably witnesses are examined before justices of the peace. It is frequently impossible, before a judicial examination, to know what witnesses will say ; for daily experience proves, how common it is for them to tell one story to counsel and another to the jury; it is only after being sworn, that a bias is disclosed ; and a previous examination, under a rule, sometimes becomes necessary, to ascertain whether a particular witness, may be called with safety. A party therefore might be cpt to pieces by an unprincipled witness, if, in the defenceless state in which he is placed by being bound down to a particular course of examination, his own evidence, thus taken, could be turned upon him. Examination, under a rule, as as measure of precaution against absence or death, would, in many instances, be too hazardous for any one of common prudence to have recourse to it ,• and thus would prove highly inconvenient in practice. Depositions are, at best, an inferior kind of evidence ; and *557 not to be encouraged beyond the limits of absolute necessity. Where, therefore, the party desiring to avail himself of this sort of evidence, might have had it taken in a way more con- ’ ° . L, ducive to fairness as respects his adversary; the Court ought to require a better excuse for the omission, than attention to his own convenience. I have given this point more consideration than is necessary to the decision of that part of the case to which it belongs, as it is one of very great- consequence in practice; but at all events, the deposition could not be received, before the party had laid the usual ground, by shewing he had taken measures to procure the attendance of the witness in person.
Then, as to the admissibility of evidence of a custom peculiar to the carrying business of the Ohio.
It is settled, that a common carrier is answerable for every degree of negligence between the determinate point of ordinary diligence, and that where the least imaginable shade of negligence begins. He is, in effect, an insurer against all perils, except those which are produced by a sudden commotion or change in the state of the elements, and which no human skill can avoid, or human force overcome ; and those which arise from the hostile array of a foreign force. The difference between a carrier and any other bailee tor hire, is, in all cases, founded on maxims of public policy and public convenience, as much as it is in the particular instance of liability for a loss by robbery, which Sir William Jones considers an exception to the general rule of responsibility, rather than a part of the rule itself. The law raises a conclusive presumption against the carrier, not only in the case of robbery, lest a confederacy should be formed between him and thieves, without a possibility of detection ; but in all cases, except those just now mentioned ; because it prevents the necessity of proof of facts, impossible to be made, in one case in a thousand, by the owner of the goods. The carrier alone can give any account of the loss and its attendant circumstances. In some cast s, his servants might be called ; but necessarily participating in whatever negligence there may have been, and being answerable to their employer, to expect them to be impartial witnesses, would be against reason and all experience. The law, therefore, does not stop to compute the quantum of care that has been bestowed: it de *558 dares the carrier liable for the slightest negligence, and assumes what is true in fact, that no loss can happen without some degree of it, unless in the excepted cases already mentioned ; and it imposes, on him the burthen of proving that t^le ^oss proceeded from a peril within one of the exceptions. He must, therefore, either stipulate for a premium adequate to the risk, or restrain his responsibility by a special acceptance of' the goods : if he has done neither, the acceptance must be taken to have been in reference to his duties at the common law. I have thus stated the common law responsibility of a carrier, together with the reason for it, in order to shew that no one can refuse his assenf to the wisdom and salutary tendency of its policy, in the abstract: the only question is as to its applicability to the carrying business of the Ohio, in particular. For I take it to be indisputable, that the common law measure of responsibility, as a general rule, is as applicable to a carrier by water from place to place within the State, or from a place within, the State to another in a neighbouring State, as it is to a carrier from a place beyond sea, or by land ; and it is expressly held so by the most respectable Courts of our sister States : as is shewn by Elliott v. Rossell, 10 Johns. 9, where the decisions in the different States are cited. And in Bell v. Reed, 4 Binn. 127, the principle seems to have been conceded by this Court; and in Lea v. Stroud, it was expressly so. This, although a Nisi Prius decision, is undoubtedly of weight to shew the view that, was taken of the law, as respects the Susquehanna, The question then is, as to the applicability of the common law rule, with respect to the Ohio, Now what is there to distinguish that river from the other rivers Of the State ? Its navigation is nót more perilous ; .and if it were, the carriers might exact a compensation adequate to the risk: the nature of the business,, the facility to practice fraud without detection, and the impossibility of shewing want of due diligence, are the same. But the common law is supposed to be altered with respect to this river by a custom.. Before we examine that matter, let us ascertain what is the law with regard to customs. ' These are: — 1. General; which constitute the universal law of the country, or, in other words, the common law. 2. Particular; which operate in, and are confined to, particular districts. And in England, 3. Particular *559 laws ; which are recognised by particular Courts of general jurisdiction; or in other words, the civil and the canon law, which, with us, are so blended with the common law, as to have become part of it, 1 Com. 69. Now general customs are never proved before the jury, but are determined by the Judges, 1 Com. 67. In Consequa v. Willing, 1 Peters, 230, it was held by the Circuit Court of the United States for the District of Pennsylvania, that where the common law is changed by a general custom, it must have.prevailed so notoriously, as to enable the Judges to take notice of it without pleading or evidence. In Carson v. Blazer, the Court, from their own knowledge, established the deviation from the common law, without referring the matter to a jury. It would, in truth, be an inversion of their respective functions, for the Court to receive the law from the jury. It will not be pretended that the finding of a general custom would be good; and if so, the evidence was clearly inadmissible to establish a general custom. Now what is the custom relied on here l Not a general one pervading the State ; for such would be part of the common law, and determinable by the Judges. It was attempted to be established as a particular custom, and (as every particular custom must necessarily be) by evidence before the jury ; and I care not whether, as having the dignity of a law of local obligation, and superseding the common law within the district where it is supposed to prevail ; or as performing the more humble office of a usage of such notoriety as to be presumed to have entered into the stipulations of the parties, and tacitly to have become a part of their agreement: the result is, in either case, the same. "With us, particular customs have no force. I know not a greater or a more embarrassing evil than a law of merely local obligation. The rule. of the carrying business of the Ohio, ought to be that of the Juniata, the Susquehanna, the Delaware, and their tributary streams. Suppose a different usage to exist in resp.ect to each — is there to be different law in respect to each ? Iti fact, ihat result would be inevitable ; for I understand the evidence to have been offered to a custom peculiar to the Ohio ; and it will hardly be expected, that a usage, the same in every particular, should prevail with respect to all our'rivers. It is impossible to get away from the conclusion, that by giving the usage any further *560 effect than that of a convenient subject of reference, to exp¡ajn a latent ambiguity in the expressions of the parties, where their meaning would be otherwise doubtful, we repeal , *. . an established principle of the common law, a matter which * apprehend is not open to us. So, that view the subject as we may, this custom or usage, if it have any operation beside what I have just assigned to it, muse have it as a rule of paramount obligation within a particular district; and not as the general law of the land. But in Bowen v. Jackson, Whart. Dig. 252, it was held by the Circuit Court of the United States, that evidence even of a usage of trade is inadmissible, when the law on the subject is settled ; and also by the same Court, in Winthrop v. The Union Insurance Company, Whart. Dig. 252, that opinions as to the construction of a contract are not evidence ; and in Henry v. Risk, 1 Dall. 265, it was held that a witness cannot be admitted to contradict the established principles of the law. In Stoever v. Whitman, 6 Binn. 416, the very principle under consideration was decided by this Court; by whom it was held, that evidence of a custom in a particular place, different from the common law, to re-enter for a forfeiture incurred by non-payment of rent, is inadmissible; the Chief Justice who delivered the opinion of the Court, declaring that miserable would be our condition, if property were to depend, not on the contract of the parties expounded by established principles of law, but on what is called the custom of particular places ; so that we might have different law in every town and village of the State. The same mischief would arise from having different law with respect to the navigation of every river of the State. But if we even had the power, what inducement have we to alter the common law ? Would its rule of responsibility, when applied to the carrying business of the Ohio, produce evils which are not felt in its application to that of the other rivers of the State, or to carrying by land ? We are to recollect, that our decision will owe.its'importance, not to the value of the-property immediately involved (although that is considerable,) but to the rule it may establish for the future ; and that if such rule be not the most convenient, the parties have, in every case, power to establish a particular measure of responsibility for themselves: it is only where they have neglected to *561 explain themselves fully, that some pre-established rule, to which they are supposed to have referred, becomes necessary. Now it is supposed, that a usage has existed, without even any knowledge of a pre-existing rule, which consequently indicates the wholesome and convenient measure. To me, however, it seems, that no measure or rule, if it can be so called, which is altogether uncertain in its nature, can be either wholesome or convenient. If we go by the common law, we shall have a definite, known rule; which, applied to the facts by the Court, will produce as much certainty of result, as legal proceedings are susceptible of: if we go by the usage, the whole matter will have to be determined by the jury, on evidence of the common practice and understanding on the subject; which would be to go by no rule at all. So that the right to compensation will, in every instance, depend on what the jury may think the proper degree of diligence. We should be perpetually inquiring by a jury as to what is the law of the land ; and the degree of diligence required of the carrier,, would be as fluctuating as the opinions of the witnesses called to establish it.
That the common law has not been so altered as to contract the responsibility of carriers by water, is proved by Lea v. Stroud and Bell v. Reid. The business qf the Delaware and Susquehanna furnishes nothing like a custom ; for on these, as well as on their tributary streams, carrying for hire is little known. The produce of the country is, for the most part, taken to market in flat bottomed boats, purchased by the owners of it, and navigated by hands that receive daily wages. The bargemen, who are, strictly speaking, common carriers, were,' till lately, mostly employed in transporting merchandise up these rivers ; a sort of navigation in which there is so little of peril, that with ordinary diligence, a loss can scarcely ever occur ; and that furnishes a satisfactory reason why there is no instance of an action having been brought against one of these, where the negligence was not gross, and palpable. These remarks are applicable only to that part of the Delaware where the tide does not flow: the carrying business from abroad to the port of Philadelphia, being governed as well by the maritime as the common law.
*562 I have said, the usage would have been competent, not as a rule of paramount obligation, but as subservient to explanation of a latent ambiguity in the bill of lading, if that term, may with propriety be applied to a fresh water transaction.I do not say there was, in fact, any ambiguity in the paper signed by the agent of the defendants. The words “ unavoidgry.i dangers of the river,” seem to me equipollent to the words “ perils of the seas,” in a policy of insurance ; and these are well understood to mean those dangers which arise from tempests, storms, rocks, and sands : they are, in fact, *« the unavoidable dangers” of the seas. There are indeed other dangers that máy justly, be said to be of the seas; but as these may be.averted by human effort, the risk from them must be borne by the master or owner, and not by the underwriter, who is an insurer against only extraordinary perils : so that it may, In general, be said, the responsibility of the one begins where that of the. other ends ; the goods being covered from all risk whatever. It is therefore a fair construction to say, the excepting of the unavoidable dangers of the river, meant no more than the exception which is made , by the common law. I, at first, thought, that as the carrier was !in effect, an insurer, the usage of the particular river might be permitted to operate on the contract, just as the usage of a particular trade is permitted to operate on the contract of insurance. But the relaxation of the - common law rules of evidence in the case of a policy, arises from the clumsiness of the instrument, which has undergone little or no alteration since it came into use; although the ever varying circumstances of trade have produced a variety of correspondent modifications, of its obligation, which is often independent of its terms. Hence the usage of every particular trade, necessarily enters into every policy, and is resorted to, for the purpose of explaining, and even controlling, those parts of the instrument that are merely formal. The contract of the carrier, however, is quite a different .thing. It is not in the form of an instrument; but the parties are supposed to express their meaning specially, without regard to form. Ifi is not a'contract of indemnity; and that the carrier is an insurer, is not its object, but the consequence of the extraordinary diligence he is bound to use. It is therefore to be *563 construed strictly according to the rules of the common law. It seems to me, therefore, the only error the Judge committed, was in favour of the defendants below, in permitting them to give evidence of the commercial meaning of the words, “ unavoidable dangers of the liver,” which were too clear, of themselves, to admit of interpretation.
Concurring with my brethren, that the other errors have not been sustained, I am of opinion, that the judgment ought to be affirmed.
Duncan J. —
There are several exceptions to the rejection of evidence, and one to the charge of the Court.
The declaration contains two counts: one on a special contract, the other against the plaintiffs in error, as common carriers.
I do not perceive any ground, on which the deposition of Joseph Woods could be received. For though I admit, a deposition taken by one party may be given in evidence by the other, yet if he offer it, he must bring himself within the rules of Court. There was no evidence given, that the witness was subpoenaed, sick and unable to attend, or resided forty miles from the Court. The deposition, when taken, is equally the property of both parties. In strictness, it should be filed in the cause. It cannot be used by either party, unless he has conformed to the rule. The plaintiff below was under no obligation to use it, or to examine the witness. If the defendants thought proper to use it, it became in a certain degree their evidence, as much as if taken by themselves. This deposition was properly rejected. The protest was properly rejected. The admission of such protests in evidence, in any case, is peculiar, to Pennsylvania. ' It is a very dangerous species of evidence, and ought not to be extended beyond the adjudged cases. It has been confined to maritime voyages, and if it were received in inland navigation, it must be received in all, be the voyage long or short» Nor is there any reason why, if it were evidence in the case of a carrier by water, it should not be equally so in the case of a carrier by land.
If there had only been a count on the special contract, I cannot see how a particular usage could be received to modify it, to lessen the responsibility assumed by the plaintiffs *564 in error. Evidence may be given of a usage fixing the construction of-words used by the contracting parties, as here, “ inevitable dangers of the river.” And here it was properly received; ‘«'inevitable dangers of the river,” is not more ’ definite or-certain than “perils of the'sea.” Yet the meaning of words usually inserted in bills of lading in sea voyages, has been explained by the evidence of merchants, proving a usage, not matter of mere opinion. The usages of traders, of trade, in a particular town, have been always received in evidence. This doctrine was very fully considered by this Court, in a case not yet reported.
The responsibility of carriers by land dnd by water, is, ia many respects, the same. The carrier by water is an insurer against every thing but acts of God and the public enemies. B v act of God, is understood, that loss occasioned by some act beyond the control and power of man to prevent. The navigation of our rivers is exposed to many and great dangers, but policy requires the adoption of some strict and rigid rule. ' When a loss happens, it is incumbent on the carrier, the onus probandi falls on him, to establish that this loss was occasioned by some occurrence beyond his power to control,---some action of the elements, something more than human acts ; tempests, sudden gusts of wind, lightning, &c„ For in the navigation of our rivers, in passing falls, the slightest variation of the wind at a particular moment, may bailie the skill of the most experienced pilot. Fora loss thus occasioned, the carrier is not liable. In the Susquehanna, these losses are very frequent. In the last spring, on that river, property to a very great amount was destroyed, where no negligence or want of skill could be imputed to the boatmen. I have, inquired into the understanding of persons concerned in the navigation of that river. It is, that the carrier is not liable for such a loss, when he. manages his boat with skill, and the loss was not occasioned by his negligence. He is not an insurer against that which no human exertion could prevent. Indeed his reward is totally inadequate to such responsibility ; and an insurance office was established to insure the owner against such perils, such unavoidable dangers of the river. In the western waters, dangers are of another kind; sudden and great rises of the wa *565 ters, shoals recently formed, and a change of the channel often occurring. In such cases, from the very nature of the navigation, from the perils to which it is exposed, different from the rivers of England, from the reward the carrier is to receive, by no means proportionable to such risk, all these tend to shew, that a different rule would neither be inconvenient nor unjust. It is the premium for the risk which distinguishes the carrier from the bailee. The latter is only obliged to keep the goods with as much diligence and caution as he would keep his own ; but a common carrier, in respect of the premium he receives, runs the risk of these, and must make good the loss, though it happen without any default in him. The reward makes him answerable for the safe delivery j Gibbon v. Paynton and another, 4 Burr. 2300. The carrier may limit, by contract, the extent of his liability ; so the usage and custom, on particular waters, may abridge and coniine it; and such usage, in the absence of a special written contract, would control the general custom or law of England. It would be the adoption of a custom different from the custom of the English realm. The great difference between our large waters and the streams of that country, has introduced different usages, and established.different rights,as in the case of fisheries on the Susquehanha. Carson v. Blazer, 2 Binn. 475. Nor is it any objection to such usage, that applies to a particular description of men, or to a particular river. Such is the right of the tenant to the way going crop ; so of many usages which are in their very nature local; for these are particular- customs, not general customs, for that would be general law. When the particular usage is known, persons generally undertaking, áre supposed to enter info the contract, with.relation to the custom. It forms a part of the contract, and is to be governed by it. The particular custom controls the general rule- The evidence offered was of a custom or usage ; and as he is liable on account of his reward, it might as well be the object, of a particular custom, to limit Jris liability, and by so doing, to, diminish his reward-, as it would be the object of a special contract. ' Here ,the' usage offered to be proved was, that a carrier for hire, on the waters of the Ohio and Mississippi', was liable for losses only in cases of negligence. This I have already said, would not be evidence on the count on the special contract» *566 the bill of lading, but on the count on the custom, the general count against the carrier ; for on that count, the question would be, what was the nature and extent of the liability; what was the custom and usage, with respect to carriers on these waters. Every count in the declaration is considered as a distinct ground of action; if the evidence offered was admissible on any count, it ought to have been received. My opinion is, that if such usage had been clearly proved, it would have controlled the general rule of law, because it would be evidence that the parties contracted with the view of, and with relation to, the particular usage, and that the reward was measured by the extent of the risk. But where there is a special contract, a particular custom, or usage, could neither enlarge nor diminish, though evidence may be received of the general understanding, interpretation, and construction of the words and terms used in such special contract. For this reason alone, I am of opinion, there is error, and that the judgment be reversed. The charge of the Court is as favourable to the plaintiffs in error as the case would, in any degree, warrant; for it is put to the jury, to decide whether the loss was occasioned by negligence or not. It is to be observed, that the construction of this instrument is precisely that which was offered to be proved by the plaintiffs in error as the usage on the waters of the Ohio and Mississippi. Negligence or no negligence, skill or no skill, are questions of fact fairly left to the jury for their own decision; and although the Court express an opinion on the' facts, they do not obtrude this opinion on the jury. It certainly is not inconsistent with the duty of a Judge, to recapitulate the important and striking parts of the evidence, to call the special attention of the jury to them, to comment on the facts, but still to leave the facts to them. If a Judge withdraw the fact from the jury, decide it himself, and instruct the jury that such are the conclusions of fact from the evidence given, this would be error. So far from this being the case, the Court set out with declaring that, they do not mean to obtrude their views of the fact on them, that they are by no means binding on them, and conclude witih declaring the law, giving an opinion on the law, but the jury are to judge of the facts. Was there a contract, a loss ? Plow was that loss occasioned,’ — by an unavoidable danger of the river, or by a want of proper care l
*567 Not understanding there would be any difference of opinion, that would render it necessary for the Judges to give separate opinions, I have, during the sitting of this Court, hastily thrown together my thoughts; though I had very fully examined the question, and made up my mind, on a mature investigation of the subject.
Judgment reversed, and a venire facias de novo awarded.