## Case No. 7,804.

### KING et al. v. SHEPHERD et al.

[3 Story, 349; 7 Law Rep. 275; 2 West. Law J. 424.] [2]

Circuit Court, D. Massachusetts. May Term, 1844.

COMMON CARRIER—PERIL OF THE SEAS—WRECK OF VESSEL—ABANDONMENT—ACT OF GOD—DUTY TO FORWARD GOODS BY ANOTHER SHIP—ESTIMATION OF DAMAGES.

1. Where a box of gold sovereigns was shipped on board the ship North America, to be carried for hire from New York to Mobile, and the bill of lading only contained the usual exceptions against "perils of the seas," and the ship was wrecked on the "Honda Reefs," and the captain then removed the box from the state room where it could be locked up, and placed it in the run where the crew had free access, and allowed it to remain there, without personally superintending it, while the wreckers were on board, and the box was lost, and a libel was brought against the captain and owners to recover its value, it was *held*, that the burden of proof was on the respondents to show, that the loss occurred by a "peril of the seas," and that failing in this, they were responsible for the loss, however it occurred.

[Cited in New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 420; Baxter v. Leland. Case No. 1,124; Roberts v. The Ocean Star, Id. 11,908; The Keokuk, Id. 7,721; The Shand, Id. 12,702; The Albany, 44 Fed. 435.]

2. Embezzlement is not a peril of the seas by the maritime law of this country; and theft or robbery is a peril of the seas, only where it is a piracy on the high seas; but not where it is committed by persons coming to the ship when she is not on the high seas, or by persons on board.

3. The mere fact. that the vessel was wrecked did not vary the liabilities of the owner and master as common carriers, unless the property perished with the wreck, and in consequence of the wrecking—but they were bound to exert all possible diligence, care and skill; and the evidence showed. that the captain was grossly negligent in the present case.

[Cited in The Shand, Case No. 12,702.]

[1] [Reported by Hon. William Cranch, Chief Judge.]
[2] [Reported by William W. Story, Esq. 7 Law Rep. 275, and 2 West. Law J. 424, contain only partial reports.]

4. The captain had no right to abandon the vessel to the care and custody of the wreckers.

5. The value of the coins was to be estimated at their worth at Key West at the time when proceedings were there instituted for salvage, with interest from such time.

6. The act of God, which would excuse a common carrier, for a loss of goods must be the immediate and not the remote cause of the loss.

[Cited in New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 425, 436; Tompkins v. The Dutchess of Ulster, Case No. 14,087a.]

7. The same rules of law are not applicable to losses under policies of insurance and by common carriers.

[Cited in Airey v. Merrill, Case No. 115; The Shand, Id. 12,702.]

8. There is no difference, in point of law, between common carriers on land and common carriers by water.

[Cited in Robinson v. Memphis & C. R. Co., 9 Fed. 139.]

9. Where a vessel, by which goods are transported for hire, becomes disabled, it is the duty of the carrier master to forward the goods by another ship, if practicable; and his duty as carrier is not ended until they are delivered at its place of destination, or are returned to the possession of the owner, or kept safely until the owner can resume them, or otherwise lawfully disposed of.

[Cited in The Niagara v. Cordes, 21 How. (62 U. S.) 27; McAndrews v. Thatcher, 3 Wall. (70 U. S.) 369; The Maggie Hammond, 9 Wall. (76 U. S.) 459; Germania Ins. Co. v. The Lady Pike, 21 Wall. (88 U. S.) 15; The Shand, Case No. 12,702; Richards v. Hansen, 1 Fed. 55.]

[Appeal from the district court of the United States for the district of Massachusetts.]

This was a suit in the admiralty in personam, with an accompanying foreign attachment. The libel set forth in substance, that the libellants [James G. King and others] were the owners of a certain quantity of gold coin of the value of $10,000. That on the 1st of November last, the ship North America, whereof the respondents [George Shepherd and others] were owners, and George S. Hall was master, lay at the port of New York, bound on a voyage to Mobile. That the libellants on the same day made a contract with the said master of the said vessel,—being then and there a common carrier of goods and passengers,—whereby the said master agreed, in consideration of a certain freight, to transport the said gold coin from New York to Mobile, and there to deliver it to G. H. Byard, saving and excepting only such loss and damage as might happen by perils of the seas. That the libellant, on the same day, delivered to the said master the said gold coin and received from him a bill of lading therefor. That, shortly afterwards, the said ship set sail, and while prosecuting the said voyage was, as the libellants have been informed, wrecked on or near the "Honda Reefs" and prevented from proceeding on her voyage. But that the merchandise on board, including the said gold coin, was saved without loss or damage and ought to be restored to the respective owners thereof.

That the said George S. Hall, contrary to his duty as master, and pretending to wrong and injure the libellants, pretends that the same has been lost, or is missing and cannot be found, or has been taken by some of the persons, who assisted in saving the said cargo, whereas the libellants charge the contrary to be true, and aver that the same has been feloniously taken by the same master and converted to his own use, and that he has withheld and intends to withhold the same from the libellants. And that the same has not been lost by any peril of the seas, which would exonerate the master and owner of their liabilities as common carriers, by reason of their contract aforesaid. The second count alleges, that the said ship went ashore on the Honda Reefs, and that the greater part of the cargo was preserved and carried to Key West, and that the whole might have been saved, if due care and diligence had been used. But that the said master and owners have not forwarded the said coin to Mobile nor accounted for the same to the libellants, and have not delivered the same, though requested so to do, and though not prevented by perils of the seas. That by reason thereof, the libellants have sustained damage to the amount of $12,000, for which the said respondents are bound to indemnify them, yet though requested they neglect to do so. That the said respondents are citizens of the district of Maine; but that they have deposited in the possession and control of the American Insurance Company, and the Washington Insurance Company, corporations duly established by law in Boston, certain goods, effects and credits, which may be attached to compel their appearance before this court to answer to its decrees. That all and singular the premises are true, and are within the admiralty and maritime jurisprudence of this court. The libel prays, that process may issue in due form against the said respondents, and that they may be arrested and required to answer all the matters herein propounded, and that the court will propound for the damages aforesaid, and for such other relief as to law and justice shall appertain.

The answer in substance stated, that the libellants were the owners of the said gold coin; that they made a contract with the said George S. Hall, as master of said ship, of which ship the respondents are part owners together with said Shepherd, for the transportation and delivery of the said gold coin, and delivered the said gold coin to the said master, and received from him a bill of lading thereof, as set forth in the said libel; that the vessel sailed on her said voyage with the said gold on board, and was wrecked on or near some of the Honda Reefs, and rendered incapable of proceeding on her voyage; and that nearly the whole of the cargo on board the said ship was saved, excepting the said gold coin; but the respondents

deny that the said gold coin or any part thereof was saved; but on the contrary, they allege and propound that by reason of the wrecking of the said vessel, and by the perils of the seas, and without the fault or negligence of the said master, the said gold coin was totally lost; though in what particular manner the said loss occurred, and whether the same was sunk in the sea, or stolen by certain persons who assisted in saving the residue of the cargo, these respondents know not. But the respondents wholly deny that the said gold coin, or any part thereof, was feloniously or otherwise taken by the said master and converted to his own use, or that he has withheld or intends to withhold the same from the libellants or their said appointees. And that in consideration of the premises, and of the exception of the perils of the seas in the said bill of lading contained, the respondents are not bound to indemnify the said libellants for any damage or loss they may have sustained by reason of the non-delivery of the said gold coin to their said appointees. The respondents admit that the said ship was advertised in New York to take freight and passengers for and from that port to Mobile. Wherefore the respondents pray, that this honorable court will be pleased to pronounce against the libel aforesaid, and to condemn the libellants in costs, and otherwise as to right and justice shall pertain.

The cause came on for a hearing in the district court upon the pleadings and evidence, and by consent a decree pro forma dismissing the libel was entered, and an appeal therefrom taken to this court.

Francis G. Loring, for libellants.
Mr. Baker and F. Dexter, for respondents.

STORY, Circuit Justice. This cause has been elaborately argued on both sides, and in its actual presentation it embraces questions of some novelty and of no inconsiderable importance. The suit is an admiralty suit in personam, founded upon a maritime contract and shipment under a bill of lading of a box of gold sovereigns of the value of ten thousand dollars—shipped on the first of November, 1842, on board of the ship North America, of which one George S. Hall was master and part owner, at the port of New York on a voyage from thence to Mobile. The bill of lading was in the usual form, and contained a description of the box as containing ten thousand dollars in gold, and the usual exception of "dangers of the seas." In the course of the voyage, the ship got ashore on the Bahama Banks, by which her rudder was knocked off, and a temporary rudder having been made, she was gotten off and sailed on her voyage, and she was afterwards, apparently from the difficulty of steering the ship with the temporary rudder, and from the strength of the winds, wrecked on the Florida Reef about the 22d of November, 1842, and

lost. While on the reef (the Honda Reefs) the ship bilged, and the master sent for and employed several wrecking vessels, commonly called wreckers, to assist in saving the cargo, and the materials of the ship. There was, besides the box of gold, another box containing $1000 in silver on board. The box of silver was found and saved. The box of gold was not found, and the loss of it has not been in any manner satisfactorily accounted for. That it was on board and safe at the time when the ship was wrecked on the Honda Reefs is admitted. That it was not lost by the stranding and wreck of the ship or submerged in the ocean, seems to me entirely clear. The loss can be accounted for only by supposing, that it was embezzled by the master of the ship, or by his officers and crew, or by the persons employed as salvors—amounting to some thirty or forty persons. It appears, that when the ship sailed from New York she had but a small cargo on board, consisting of materials of and for carriages, coal in casks, and goods in casks, and some other merchandise. She had a large number of passengers on board. When she struck on the Bahama Banks, the passengers left the ship and went on board of a schooner, called the Ellen, which was near them, and the master of which contracted to carry the passengers to Mobile. Captain Hall concluded (at first) to send the specie to Mobile by one of the passengers going there in the schooner Ellen, and accordingly he caused the specie to be removed on board of the schooner. He afterwards changed his mind, and it was brought back again and taken on board of the ship. Up to this period the specie had always been kept in one of the state rooms in the lower cabin, under lock and key. It was returned there; and a day or two afterwards the captain caused it to be removed into the run, deeming it, as he said, a place of more safety, especially while the crew were fixing the temporary rudder and constantly passing through the cabin. It is fully established by the whole current of the evidence, that the run was not separated by any bulkhead from the hold, and that it was easily accessible therefrom by the crew and the salvors. The cargo and materials saved were carried to Key West, where regular proceedings were instituted for salvage by the salvors in the admiralty court there, and in one of the allegations, the libel expressly charged that they (the salvors) believed the missing box of gold was either in the possession of Captain Hall, or that he was aware of the place where it was secreted. To this allegation Captain Hall in his answer excepted "as being impertinent and improper, and prayed the same to be stricken out by the court." But in answer to one of the interrogatories propounded in the libel, he said "that he does not know where it (the box of gold) is." No allegation was set up by Captain Hall, in his answer, of any embezzlement of the box of gold by the salvors—nor

was any mode suggested as to its loss. The court of admiralty decreed a salvage of 45 per cent. to the salvors; but refused to decree. that the residue be paid over to Captain Hall for the use of the owners thereof, upon the avowed ground, that the circumstances of the case affected him with such apparent fraudulent or improper conduct, that he could not be safely intrusted with it. From this decree an appeal was taken to the court of appeals of Florida, so far as the decree refused to restore the residue of proceeds, after deducting the salvage, to Captain Hall—leaving the decree as to salvage to the salvors to stand without question; and upon this appeal the appellate court reversed the decree of the superior court, and ordered the residue to be restored to Captain Hall, stating however in their opinion, "that though the facts proved may well raise a suspicion, yet they are not of a character sufficiently conclusive to justify the withholding of the residue of the proceeds in question, and they must, therefore, be restored to him" (the captain).

Under all the circumstances of the case, the general question presented is, whether the present loss is to be borne by the shippers, or whether the owners of the ship are, as common carriers, responsible therefor. It is not denied, and indeed it is beyond all doubt, that the owners of the ship were in this case common carriers, and, of course, they are responsible for all losses not caused by "the dangers of the seas"—which is the common exception and the only exception in the present bill of lading. Now, the burthen of proof is on the respondents to show, that the loss arose from this cause; and if they fail to establish it, they are responsible for the loss, however otherwise it may have arisen, whether from theft or embezzlement, or negligence. or inadvertence. Lord Tenterden, in his work on Shipping (5th Ed., pt. 3, c. 3, § 9, p. 244), lays down the rule in explicit terms and says, that the master and owners of a ship "are responsible for goods stolen or embezzled on board the ship by the crew or other persons;" and the same rule is laid down by Roccus (De Nav. et Naut. n. 40). Proprietors of Trent & M. Nav. Co. v. Wood, 4 Doug. 287; Dale v. Hall, 1 Wils. 281; and Smith v. Shepherd. Abb. Shipp. (5th Ed.) pt. 3, c. 4, § 1, p. 252,—inculcate the same doctrine. See, also, Story, Bailm. §§ 516–526. In this last case it was expressly held, that the act of God, which would excuse a common carrier, must be immediate and not the remote cause of the loss. The American cases fully recognise the like doctrine. Schieffelin v. Harvey, 6 Johns. 169; Elliot v. Rossell, 10 Johns. 1; Williams v. Branson, 1 Murph. 417; Jones v. Pitcher, 3 Stew. & P. 171–180; Sprowl v. Kellar. 4 Stew. & P. 382; Campbell v. Morse, 1 Harp. 468. A loss by the robbery of pirates on the high seas has indeed been held to be a peril of the seas; but not a loss by robbery of any persons coming from the shore, while the ship is lying in port in a river within the body of a country. Lord Tenterden upon this subject says: "As soon as the goods are put on board, the master must provide a sufficient number of persons to protect them, for even if the crew be overpowered by superior force, and the goods stolen while the ship is in a port or river within the body of a country, the master and the owners will be answerable for the loss, although they have been guilty of neither fraud nor fault, the law holding them responsible from reasons of public policy, and to prevent the combinations that might otherwise be made with thieves." Abb. Shipp. (5th Ed.) pt. 3, c. –, § 3, p. 223; Story, Bailm. §§ 528, 529. In this language he is fully borne out by the case of Morse v. Slue, 1 Vent. 190, 238; Barclay v. Cuculla y Gana, 3 Doug. 389; and Proprietors of Trent & M. Nav. Co. v. Wood, 4 Doug. 287. The cases of Schieffelin v. Harvey, 6 Johns. 169, and Watkinson v. Laughton, 8 Johns. 213, are to the same effect. The court have applied the same rule in cases of mere theft, but distinguished between mere theft (furtum) and robbery with violence, (latrocinium), holding the latter to be a loss by vis major or inevitable accident, but not the former. The Digest says: "Nisi hoc esset statutum, materia daretur cum furibus adversus eos, quos recipiunt coeundi cum ne nunc quidem absteneant hujus modi fraudibus" (Dig. lib. 14, tit. 1, c. 1, § 1); thus giving the very reason, which our law sustains and applies as well in respect to mere robbery on land as to theft. But the civil law treated (as has been already stated) robbery as being governed by a different rule, and as damnum fatale. Gothofred, in his Commentary, observes: "Adversus latrones parum protest custodia; adversus fures prodesse potest, si quis advigilet—Latrocinium fatale damnum, seu casus fortuitus est; at non furtum." Goth. ad Dig. lib. 17, tit. 2, c. 52, § 3, note 24, cited; Abb. Shipp. (5th Ed.) pt. 3, c. 3, § 3, p. 223, note 1; Boul. P. Dr. Com. term 4, tit. 10, § 15, p. 35.

It is upon this distinction, thus recognised by the Roman law, but not by our law, between a loss by theft and a loss by robbery, that the French ordinance on Insurance (Valin, tome 1, p. 74, sur L'Ordin. 1672, liv. 3, tit. 6, art. 26) proceeds, and declares, that the insurers shall be liable for all losses by "pillage" on the high seas, the word "pillage" being equivalent to latrocinium, or theft with violence, in the sense of the French law. And so, accordingly, it is interpreted, and the point ruled by Emerigon, who says, that under this article of the ordinance, the insurers are not liable for losses by simple theft (vol simple) in the ship, but only for theft by violence (vol fait avec violence). This at once explains the citation at the bar from Pothier (d'Assurance) n. 55. and demonstrates, that it proceeds upon a ground not recognized in our law; which does not treat theft or robbery upon the high sea as a peril of the seas, unless it be an act of piracy, perpetrated by pi-

rates, and not an act of theft or plunder, or embezzlement, perpetrated by the officers or crew of the ship, or by other persons lawfully on board. Now, in no just sense can either the officers or the crew of the ship North America, nor the salvors coming on board with the consent, and at the request of Capt. Hall, be treated as pirates, even although they may have been guilty of embezzlement. The answer of the respondents does not attempt to put the loss, as one caused immediately by any peril of the seas, or by piracy. The law, on this point, agrees: "That by reason of the wrecking of the said vessel, and by the peril of the seas, and without the fault or negligence of the said master, the said gold coin was totally lost, though in what particular manner the said loss occurred, and whether the same was sunk in the sea, or stolen by certain persons, who assisted in saving the residue of the cargo, these respondents knew not." This allegation is far too loose and general, for the court to act upon it; and if the respondents cannot assert how the loss took place, in what manner is the court to discover it? If the gold coin was stolen by the officers, or crew, or salvors, it is plain from what has been said, that it is not a loss by the perils of the seas, in the sense of the common law. And as has been already suggested, there is not a tittle of evidence to show, that it was submerged by the stranding or shipwreck, and on the contrary, every presumption in the case leads in the opposite direction.

The arguments of the respondents seem to suppose, that by the stranding and wreck of the ship, although the gold coin did not perish or sink in the ocean thereby, that the duties of the owners and master, as common carriers were varied, and that they were thereafter exempted from all liabilities, except for reasonable diligence and care in their endeavors to save the property. But I do not so understand the law. On the contrary, I understand that their obligations and liabilities, and duties, as common carriers still continued, and that they are bound to show, that no human diligence or skill, or care, could save the property from being lost by the stranding or shipwreck (Elliot v. Rossell, 10 Johns. 1); but that it perished with the wreck, and then the maxim might apply, "Res perit domino"; but certainly it could not apply where the loss was by theft or embezzlement, by persons in the employ of the owners and master, and not acting piratically and with hostile force or irresistible violence. If in the present case, upon the stranding and wreck, the property had, before it was delivered from the peril, been plundered by pirates, or any assailing thieves from the shore, acting in adversion and with violence and force animo furandi, there might have been ground to say upon a policy of insurance, that the subsequent loss was properly attributable to the first peril—the stranding or wreck. See 1 Phil. Ins. (2d Ed.) c. 13, § 9, p. 649; Bondrett v. Hentigg, 1 Holt, N. P. 149; Peters v. Warren Ins. Co., 14 Pet. [39 U. S.] 99, 110, 111; Hahn v. Corbett, 2 Bing. 205. But I do not know, that even in such a case, the same rule has been applied, or ought to be applied to the liability of a common carrier; and certainly Barclay v. Cuculla y Gana, 3 Doug. 389; Morse v. Slue, 1 Vent. 190, 238; and Proprietors of Trent & M. Nav. Co. v. Wood, 4 Doug. 287,— are strongly the other way. It is suggested, that here the contract was for the carriage of the goods in the ship North America; and not in any other ship; and that when she was lost, the duties of carrier were ended, and the contract prevented from being performed, by the perils of the seas. But this is not a true view of the law upon this subject. The gold coin was to be transported in that ship, if she was in a condition to carry it. But when she became disabled, it was the duty of the carrier master to carry it on or send it in another ship, if practicable; and his duties as carrier were not ended until the property was delivered at the port of destination, or returned to the possession of the owner, or kept safely until the owner could resume it, or it was otherwise carefully disposed of. This, doctrine is very clearly stated by Lord Tenterden, in his work on Shipping. Abb. Shipp. (5th Ed.) pt. 3, c. 3, § 8 c. p. 242. And we all know, that it is familiarly applied in cases of insurance. See 1 Phil. Ins. (2d Ed.) c. 12, § 1, pp. 485, 486; Plantamour v. Staples, 1 Marsh. Ins. bk. 1, c. 5, § 2, p. 169; Id., 1 Term R. 611, note; Id., 3 Doug. 1. Whether, under such circumstances, the master and owners would be liable as common carriers, for any losses which might arise after their charge of the ship, or other vehicle of transportation and use, not occasioned by the perils of the seas, or by the want of proper diligence and care on the part of the master and owners themselves, is a point not necessary to be here decided; because the coin was not so sent on, but remained in the custody and care of the original carriers, until the time of the loss. There is no difference, in point of law, between common carriers by water, and common carriers by land. Each incurs the same obligations and liabilities, and is subject to the same duties. Elliot v. Rossell, 10 Johns. 1. Now, let us suppose that the wagon in which the goods are on the course of transportation, should break down, and become incapable of performing the journeys, would the duties of the carrier cease? would he not be liable for any subsequent theft or robbery of the goods, while under his care, and control, and custody, or those of his servants and persons employed by him? I apprehend, that as in the case of a ship when wrecked, he would be obliged to send on the goods by another conveyance, to their proper place of destination, if any

can be obtained; if not, to keep them as a common carrier should, until they can be delivered up to the owner, or otherwise disposed of accordingly to law. The rules, which regulate losses under policies of insurance, are by no means the same as those which either necessarily or ordinarily govern in cases of common carriers. Each contract has its own peculiarities and principles of interpretation; and it is not safe, in many instances, to reason from one to the other. In cases of collision of ships, for example, the loss is treated as a peril of the seas, whether caused by accident, or by the fault of one party, or of both parties. See Hale v. Washington Ins. Co. [Case No. 5,-916], and the cases there cited; Peters v. Warren Ins. Co., 14 Pet. [39 U. S.] 99. But who ever heard that a carrier was exempted from any loss caused or occasioned by the negligence of himself or of his servants? Here, it appears to me, that the dangers of the seas are not shown to be the direct or immediate cause of the loss, causa proxima—as the case of Smith v. Shepherd affirms it should be to exempt the carrier from liability. My own opinion is, that the loss of this coin was occasioned solely by embezzlement or theft; and it matters not whether it was by the officers or crew of the ship, or by the salvors employed by the master.

But even if the present case turned upon the question of due care and diligence on the part of Capt. Hall, I should say, that he was, upon the evidence, guilty of the grossest negligence and want of care. I do not impute to him personally any fraud or embezzlement, for it is unnecessary so to do—although there are circumstances in the case, which may well leave the mind in some doubt upon this point. His conduct throughout appears to me wholly unaccountable, and just such as no reasonable, prudent, or thoughtful master in such exigencies could or ought to have adopted. He removed the coin after the stranding, from the state room into the run. Why was this done? Was it less secure in the state room, after the passengers, some fifty in number, had left the ship, than before? It is said that he thought it a more safe place of deposit. Why was it? The state room had a lock and key. If broken open, the fact would be easily shown, and an immediate examination and search had. How was it with the run? There was no bulkhead there; it was easily accessible to the crew, as all the evidence shows, and equally as accessible to the salvors. What additional safety then could there be against the coin by removing the box from a locked state room, inaccessible except by breaking the lock or forcing the door, and placing the box in the run, where, without breaking or forcing, the crew could readily have access to it? But this is not all. The box of coin was of great value—$10,000—and all the oth-

er property on board as cargo, of comparatively small value—bulky, and not easily concealed or embezzled. Capt. Hall selected his own time for receiving the salvors on board. Why, knowing full well the value of the box, did he not, before they came on board, secure it, relock it in his state room, or place it under lock in his trunk? How did it happen, that with a full knowledge, that the salvors were to remove the cargo, that he never once examined the run; that he took no personal precautions to insure the safety of the box; that he never once made any search where it was; and never, as he ought to have, retained it in his own personal custody, or that of one of his mates, during the whole of the day and evening when the wreckers came on board? If the wreckers had been as lawless, barbarous, and unprincipled as it is now suggested they were, this called for double vigilance on his part, and how did it happen that the box of silver was not embezzled by the wreckers, if the box of gold was? Instead of attending to this paramount duty under the circumstances of saving this large shipment of specie, Capt. Hall seems to have busied himself about every thing else, however unimportant or trivial. He could take great care of his own trunk and apparatus, of some of the rigging and sail, and casks of coal and goods. But he seems to have thought no vigilance necessary to preserve the specie. It is suggested, that he had no command over the wreckers. That does not appear; but on the contrary, as I think, they acted under his orders. It is suggested, that he surrendered all to the care and custody of the wreckers. That he had no right to do. They were to act under him and not over him. And I see not the least reason to suppose from the evidence, that they ever renounced his authority or disobeyed his directions.

If we turn to the proceedings for salvage in the admiralty, not a single difficulty is removed, and indeed, every doubt is strengthened. We have seen, that the libel of the salvors expressly charged the box of gold to be in the master's possession or under his control. Instead of meeting the allegation by a direct denial, and an allegation, that it was lost by the perils of the seas, or embezzled by the crew or salvors, he evades the inquiry "as impertinent and improper," and thereby leads to the conclusion, that he adopted that course to escape salvage on the gold, which the opinion of the court shows to have been suggested at the argument, or leaves the case naked of any pretence on his own part, that there was any loss thereof by the perils of the seas, or by embezzlement, or any other manner, which he chose to avow or to support by evidence. If the box had been embezzled by the wreckers, that would have amounted to a complete forfeiture of all their right to salvage. Yet Capt. Hall

makes no objection to the salvage, and a very large allowance, viz. forty-five per cent is made, and acquiesced in by him, without objection or appeal. How has it happened, that not a human being ever saw the box of coin after it was first put into the run—or ever was called upon by Captain Hall, to attend to its safety—until the very hour when the wreckers came on board? I am sorry to be obliged to come to the conclusion, that a more aggravated case of gross negligence, under circumstances of so little urgency and peril, never came before this court. I do not dwell upon other considerations of a more intricate character, nor upon some portions of the evidence which might lead to a more harsh conclusion. My judgment is, that the owners are responsible for the loss of the box of gold, and that no facts have been shown, that establish the loss to have been by the perils of the seas. Under such circumstances the libellants ask to have the value of the gold coin (the sovereigns) allowed them as if they had arrived at Mobile. I do not know, that there is any difference between the value there and at Key West. But as they were not carried to Mobile, and might never have arrived there, the true test is the value at Key West, with interest upon the value from the time when proceedings for salvage were instituted at Key West. I adopt that date, as allowing full time for Capt. Hall, if he had exercised reasonable diligence, to have ascertained all the facts—or at least, all which were within the reach of an interested and vigilant master and owner. The decree of the district court is, therefore, reversed, and a decree for damages and interest, according to the rule above suggested, is to be entered for the libellants with costs.