## THE ALBANY.

### (*District Court, E. D. Michigan.* December 8, 1890.)

1. SALVAGE—LIABILITY OF SALVOR—EMBEZZLEMENT.
    A salvor is bound to take such care of the property saved as a prudent person takes of his own property, and is liable for the plundering or embezzlement of such property by his servants or agents.

2. SHIPPING—DUTY OF MASTER—GIFT OF CARGO.
    While the master of the stranded vessel may, in case of urgent necessity, throw overboard or otherwise sacrifice his cargo to obtain the release of his vessel, he has no right to give it away. Under such circumstances, the donee takes no title to the property, is liable therefor as bailee, and is bound to surrender it upon the demand of the owner.

3. SALVAGE—EMBEZZLEMENT BY SALVOR.
    Libelants, who were the owners of a tug, contracted to render certain services to a stranded propeller for an hourly compensation. During the performance of such services she received on board a part of the cargo of the propeller, which the officers and crew of the tug subsequently embezzled and divided among themselves. *Held*, that libelants were chargeable with the value of the property so embezzled.

4. SAME—NEGLIGENCE—LARCENY BY THIRD PERSONS.
    Two lighters which also belonged to libelants were also employed in removing portions of her cargo, and were sent by libelants to a wharf to which the public could obtain access by day or night. While laying there, a party of marauders came during the night, and, by collusion with the men in charge of the lighters, stole a large part of their cargoes. *Held*, that libelants were guilty of negligence in failing to take proper care of the property, and were liable for its value.

5. SAME.
    During the performance of these services the officers of the tug entered into a corrupt agreement with the men in charge of two other lighters, in which libelants had no interest, to tow them to the propeller and back for a share in such part of the cargo as they might secure. These lighters were also laden with the cargo of the propeller, all of which was subsequently embezzled or stolen. *Held*, that such agreement was not binding upon the owners of the tug, and that they were not liable for the property so embezzled.

(*Syllabus by the Court.*)

In Admiralty.

On libel for salvage and cross-libel for embezzlement.

This libel was filed to recover the sum of $805 for the use by the propeller Albany of libelant's tug Major Dana for 73 hours, from 8 o'clock A. M. of November 28, 1887, at $10 per hour, and for 3 days' use of 2 lighters, at $25 per day, during the same period. In support of

their claim, libelants offered in evidence a bill, certified by the master of the Albany, for this amount.

The answer and cross-libel alleged—

"That by said hiring it became and was the duty of the master and crews of said tug and lighters to take all proper care and use all proper skill in such service, and in saving and preserving such part of the cargo as they might receive upon the said tug and lighters from said propeller, for the owners thereof. Respondent denies that they took all proper care and used all proper skill in saving and preserving such cargo; * * * that said services were performed in so careless, negligent, and incompetent a manner that a large amount of property which they undertook to transfer from the said propeller by the said tug and lighters was lost to this respondent by reason of the negligence and incompetency of those in charge of said tug and lighters."

The facts developed by the testimony were substantially as follows:

About 6 o'clock in the evening of Thursday, November 24, 1887, the propeller Albany, of 1,917 tons burden, bound from Chicago to Buffalo, laden with a large and valuable cargo of flour, corn, lard, and merchandise, stranded upon Poe's reef, in the straits of Mackinaw, near Bois Blanc island, and about 7 miles from Cheboygan, during a thick, driving snow-storm. The lateness of the season and the exposure of the locality combined to make the steamer's situation most perilous, and warranted prompt and energetic measures for her speedy release. During the night she sounded alarm whistles, and threw overboard a considerable quantity of her cargo, so that by daylight of November 25th the waters were covered with sacks and barrels of flour, and the shore by Duncan and Cheboygan lined with the abandoned property. About 7 o'clock in the morning of Friday, November 25th, her mate was sent to Cheboygan, the nearest port, for assistance, and upon the way met respondent's tug, Major Dana, under charge of William Elliot, libelant's general agent and manager, who, hearing the signals of distress from the Albany, had taken the tug, and was then upon his way to her assistance. There was also on board one Harry Roberts, foreman and manager of libelant's machine-shops at Cheboygan. The Major Dana proceeded to the Albany, and on her arrival there Capt. Frank Williams, master of the Albany, and Elliot, master of the tug, agreed upon terms for the use of the tug at $10 an hour. Capt. Williams also agreed to pay $25 a day each for lighters which Elliot agreed to provide for the salvage of the Albany's cargo. At the same time the captain of the Albany requested Elliot to bring him out a gang of men to help unload his boat. The tug left the Albany, returned to Cheboygan, obtained two lighters and a number of laborers to work in handling the cargo, and about 11 o'clock returned to the Albany under the command of Capt. Charles Robinson, her regular master, and with William Elliot still on board. The lighters were at once made fast on the port side of the Albany, and were promptly laden by the men brought out from Cheboygan, who were hired for, paid by, and worked for, the Albany, and were not in the employ of the libelants in such service, or subject to their orders or control. One Todd, who never seems to have been in libelant's employ, was selected by Capt. Williams as time-keeper. While the lighters were being loaded on the port side of the propeller, the Albany's crew were throwing flour overboard on the starboard side. On one of the lighters was put all the lard in the cargo, 50 tierces, and a large quantity of flour in 140 and 280 pound sacks and barrels. The other lighter was loaded wholly with flour. Capt. Williams' instructions were that the flour and lard should be taken to Cheboygan and warehoused. Seeing the flour thrown overboard from the Albany, Capt.

Robinson asked Capt. Williams to throw some of it on his tug. The latter told him to bring her along-side, and he did so, and they did throw upon the deck of the tug, around the pilot-house and in her cabin, 30 to 40 sacks and 10 or 12 barrels of flour.

The tug then proceeded to Cheboygan with dispatches, and while there the flour, except the portion in the cabin, was unloaded upon McArthur's dock. Robinson claimed that he supposed that the property had been abandoned by the Albany, and that it belonged to him, and told the man in charge of the dock that when he got time he would come and take care of it. But when afterwards he went for it he was informed by the man in charge of the dock that it had been put with and shipped in another load. The tug returned to the Albany with dispatches, and found the two lighters loaded, when they were taken in tow by the tug to Cheboygan. The captain of the Albany had instructed Todd to put a gang of men on the lighters, with a man in charge, take them ashore and unload the stuff in the Michigan Central warehouse. In obedience to these instructions, Todd selected a gang of 15 or 20 men to go upon the lighters, and one John Knox to take charge of them. These men were selected from those unloading the Albany. This man, Knox, did not seem to have been in the employ of libelants at this time, although he had been prior to that. The lighters, with the men on board and in charge of Knox, left for Cheboygan about 1 o'clock in tow of the tug, and as soon as they got away from the Albany her master gave orders to throw the cargo overboard, and they rolled it into the water as fast as they could from both sides. When the tug left the Albany with these lighters, her master was instructed by the captain of the Albany not to bring back any more lighters, that he would not try to save any more, and he told the captain of the Saugatuck the same thing. The two lighters were taken to Cheboygan, and application made to the railroad for a warehouse. The agent replied that it would be necessary to get permission from the head office at Bay City. While the lighters were lying at the Michigan Central Railroad dock, the men on board them were stealing the stuff, and throwing it overboard so that they could better steal it. Owing to the excitement caused by the great sacrifice of property by the Albany, libelants concluded it would be unsafe to leave the lighters there with the loads upon them overnight, and decided to take them to their private dock at Duncan city for greater security. The property at Duncan was the sole property of the libelants, the neighborhood being sparsely settled. It was situated about a mile and a half from Cheboygan, and libelants had repeatedly left lighters loaded with flour at their docks there without loss. The public had no access to said docks without permission, and by going through libelants' private grounds. As the tug was proceeding with the lighters from Cheboygan to Duncan, her captain was hailed by men upon two other empty lighters, known as the Nelson and Bob Robinson lighters, who wanted to know if they were throwing stuff overboard from the Albany, and requested him to give them a tow out there. In answer to this request, Elliot said to the master of the tug: "If the boys can pick up some flour, you can take them out; we have nothing to do with it." The two empty lighters were taken out as far as the dummy, and left there, while the two loaded ones were taken to libelants' dock at Duncan city, tied up, and left in charge of John Knox, who, for part of that day, had been working upon the Albany. The tug then returned, picked up the empty lighters, and took them out to the Albany, reaching her after dark, between 7 and 8 o'clock P. M., when they were laden that night with flour and corn, and towed to the Nelson and Cass House docks at Cheboygan by the Major Dana. Later in the evening, at Knox's request for some one to help him pump the lighters, one Leischman, whose day's work for the libelants was ended, was requested to go to the light-

ers and assist Knox. When the tug with the empty lighters arrived at the Albany, the failure to get the warehouse was reported to her master, and he was informed that the two first lighters had been taken to Duncan city and laid up for the night. He asked if Knox had been left in charge of them, and, upon being informed of the fact, replied: "All right, take them to Cheboygan next morning, and unload them." When the tug returned to the Albany with the empty lighters, the men were still throwing corn and flour overboard. The men in charge of the lighters sought to obtain some of the stuff so being abandoned, and placed one lighter on each side of the Albany. One Clark, in charge of the lighter Nelson, claimed to have bought from the mate about 30 to 40 bushels of corn and about 30 barrels of flour for a merely nominal sum. The Bob Robinson was loaded in substantially the same way, and no account was kept of what went on either of them by any one on the Albany, although the Bob Robinson is said to have had a full load, and her capacity was estimated by some of the witnesses as being between 300 to 400 barrels. The flour and corn were about the same time being sold off the Albany to other parties. While the two lighters were being loaded, there was rolled upon the tug off one of them, by some of the men, for themselves, from 10 to 14 barrels of flour. The tug then took the two lighters back to Cheboygan, and left them there late Friday evening. Her master, Robinson, left her there, and went to his home in Cheboygan for the night, and Elliot took the tug to her dock at Duncan. From the cargoes of the first two lighters left at Duncan city, there were stolen that night 21 tierces of lard and a large quantity of flour, estimated at about 211 barrels. The flour and corn which composed the loads of the second two lighters, the Nelson and Bob Robinson lighters, which were towed by the Major Dana into the Cheboygan river, and there unladen, was *all* stolen, and divided among the men on board of them. Not a sack or barrel of flour or a bushel of corn was spared. When the tug reached Duncan, after leaving the Nelson and Bob Robinson lighters at Cheboygan, the flour on her, which had been procured by Capt. Robinson in the morning, and not left at McArthur's dock, and that put upon it by Campbell and others in the evening, was divided between the men. Some of it was left on the dock at Duncan, and afterwards put on one of the lighters, taken to Cheboygan, put into the warehouse, and shipped, with the rest, to the transportation company.

*H. C. Wisner* and *W. S. Humphrey,* for libelants.

*H. H. Swan,* for claimant.

BROWN, J., *(after stating the facts as above.)* The real question in this case is whether the libelants are responsible for the wholesale plunder of the property placed upon the tug and these lighters, and the answer to this practically depends upon the further question whether the men in charge of such tug and lighters were employed by the libelants or by the Albany, or were merely marauders acting upon their own responsibility.

There is no doubt of the general proposition that salvors are bound to take such care of the property saved as a prudent person takes of his own property; that they are liable for the consequences of their own negligence or misconduct; and that, in case of a gross breach of trust or embezzlement of the property, the court may decree an entire forfeiture of their claim upon the same principle that a seaman's right to wages may be forfeited by his misconduct. *Mason* v. *The Blaireau,* 2 Cranch, 240; *The Senator,* Brown, Adm. 372; Jones, Salv. c. 7.

With regard to the responsibility of a principal for the willful or criminal acts of his agents and servants, the general rule is still as laid down in *McManus* v. *Crickett*, 1 East, 106; *Foster* v. *Bank*, 17 Mass. 479; and *Mali* v. *Lord*, 39 N. Y. 381,—that the master is not liable for the willful acts of his servants, committed without his express or implied authority, unless, at least, they are done strictly within the scope of their employment; but there is no doubt that in the case of inn-keepers, common carriers, and ship-owners, they are, upon grounds of public policy, liable for the embezzlement of their servants and agents, (*Schiefjelin* v. *Harvey*, 6 Johns. 170; *King* v. *Shepherd*, 3 Story, 349; *The Niagara*, 21 How. 7; *Nugent* v. *Smith*, 1 C. P. Div. 33; *The William Taber*, 2 Ben. 329; *The E. M. McChesney*, 8 Ben. 150.) Thus in *The Amiable Nancy*, 3 Wheat. 558, the owners of a privateer were held civilly liable for the acts of her crew in plundering a neutral vessel; Mr. Justice STORY observing that—

"This is a suit against the owners of the privateer, upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them. * * * They are innocent of the demerit of this transaction, having neither directed it nor countenanced it, nor participated in it in the slightest degree. Under such circumstances, we are of opinion that they are bound to repair all the real injuries and personal wrongs sustained by the libelants; that they are not bound to the extent of vindictive damages."

See, also, *The Anna Maria*, 2 Wheat. 327. In *Taylor* v. *Brigham*, 3 Woods, 377, it is said that—

"The law treats the captain of a boat as in some sort a subrogated principal, or qualified owner of the ship, possessing authority in the nature of exercitorial power for the time being, and his liability, founded upon this consideration, extends not merely to his contracts, but to his own negligences, malfeasances, and misfeasances, as well as to those of his officers and crew. * * * The owners are even liable for the willful and malicious acts of the master, done in the course and within the scope of his employment."

How far the liability of the owner of a salving vessel extends for the misconduct of his officers and crew may admit of some doubt. The authorities upon this point are not altogether in harmony, and perhaps the prevailing rule cannot be better stated than by saying that the owner is not liable for the secret and independent acts of his crew; but it would be a singular anomaly to allow them a claim for salvage when the very purpose for which the service had been undertaken had been defeated by a wholesale plunder of the property saved. In the case of *The Boston*, 1 Sum. 328, 341, Mr. Justice STORY says:

"In cases of salvage, the party founds himself upon a meritorious service, and upon an implied understanding that he brings before the court, for its final award, all the property saved, with entire good faith, and he asks a compensation for the restitution of it uninjured and unembezzled by him. The merit is not in saving the property alone, but it is in saving and restoring it to the owners. However meritorious the act of saving may have been, if the property is subsequently lost, and never reaches the owner, no compensation can be claimed or decreed. * * * What claim could be more ex-

traordinary than an enunciation by a salvor in a court of justice that he had saved the property, and had perpetrated a gross fraud or theft upon the owner, for the purpose of withdrawing the property from him, and then to ask, in the same breath, for a compensation for his labor, notwithstanding his iniquity?"

In the case of *The Island City*, 1 Black, 121, a barque in distress had been taken in tow by a steamer and brought into port; but while "in possession of the steamer the officers and crew of the latter broke open the chests of the master and seamen of the barque, robbed them of their clothes, watches, and money, carried away the quadrants and barometers of the ship, rifled trunks on freight, and this pillage was committed extensively, and upon a plan of general plunder, by the mate and many of the seamen, without opposition from any of them." It was held that all the salvage apportioned to the crew should be forfeited on account of their misconduct, but that the owners of the steamer were entitled to their proportion.

In the light of these authorities, let us consider the relations of these parties to the libelants and to each other. Libelants owned the tug and first two lighters. They were also largely engaged in lumbering and machine-shop business, and a general store; owned docks, mills, and shops at Duncan city, and employed several hundred men, who lived in the neighborhood, and who, when the mills were shut down, took employment where they could find it. Witness Elliot was the "general outside foreman" of libelants; had "the general oversight of all the outside work," having full control and authority over the hiring and employment of the tug. He made the bargain for the use of the tug and lighters in this instance, and accompanied the tug upon all her trips to the Albany. How far he shared in the plunder of this property may admit of some doubt, though the testimony tends to show that a portion of it was left at his house, at least without his dissent, and that he was standing upon the dock while the flour was being taken away from the tug, and must have known what was being done with it. He seems even to have directed a part of it to be sent to Roberts, his brother-in-law, who was foreman of the machine-shops, though it is but just to him to say that he made restitution of one tierce of lard that he had received, after keeping it for about three months, and paid for most of the flour. Robinson was the master of the tug, and commanded her throughout the day, except upon her first trip, when the bargain was made. He was not only privy to the conspiracy, but received a portion of the plunder, though he seems to have afterwards lost it. Roberts was libelant's foreman, was actually engaged with the others in the plunder, receiving a tierce of lard and four and a half barrels of flour. McDougall, the engineer of the tug, admits receiving eight or nine sacks of flour. George Smith, the fireman, also received several barrels, while the rest was divided up among the crew.

I do not see how it is possible for libelants to escape liability for the loss of the property laden upon the tug. It was claimed with respect to

this that the flour was only rolled upon it to save it from being thrown into the lake, and that it was virtually a gift from the captain to the men upon the tug; but, as the lighters had been hired for the express purpose of saving the cargo, it is very improbable that the captain should have intended to give away that portion of it which went upon the tug. Aside from the improbability of his doing this, Capt. Williams had no right to sacrifice property in this way. It was not within the scope of his authority to give away property which could possibly be saved, and the crew of the tug were bound to know this, and were bound to deal with the property as salvors. A man cannot give away that to which he has no title. The master of a vessel has possession of the cargo for the purposes of transportation and delivery, and he has no more right to give it away to another than he has to sell it, and put the money in his own pocket. A gift under such circumstances conveys no title, and the donee is chargeable for the conversion of it as for embezzlement.

With regard to the property on the first two lighters, the case is not essentially different. Under instructions to take them to Cheboygan and put their cargoes in warehouse, the lighters were towed to Cheboygan, and libelants, failing to obtain the use of the Michigan Central warehouse, sent them to Duncan city, where it was their clear duty to see that they were kept in safety until they were unladen. They were left in charge of one Knox, a man who had been employed for several seasons by libelants, but who had been paid off the Wednesday night previous. He had been taken off with a gang of men to the Albany, worked on her eight hours, for which Todd, who had been recommended by Capt. Robinson of the tug to Capt. Williams of the Albany as a time-keeper, allowed him $60. Knox says his time with libelants "went right on" under an arrangement with Roberts, and for this generosity he allowed a charge of $10 to be placed against his account for Roberts' benefit. Knox was put in charge of the lighters at Duncan city, apparently by the orders of Robinson and Roberts, and perhaps with the consent of Capt. Williams of the Albany, under whose pay he was at the time. He exhibited his faithfulness to his trust by getting drunk, going to sleep, permitting the cargoes of the lighters to be looted by a gang of marauders during the night, and sharing in the plunder. Leischman, who was sent by Roberts to go down to the lighters, stay with Knox, and help him pump them out, had not been to the Albany at all, but was an employe of libelants, and had been working in their shop, running the bolt-machine. He says that no instructions were given to him about taking care of the property, and gives this as an excuse for offering no opposition to the raid that was made upon the lighters that night, and for receiving his share of the plunder. Indeed, both Knox and Leischman, instead of protecting the property, as it was their duty to do, seem to have been the aiders and abettors of a gang of thieves, who came to the dock that night with such wagons as they could obtain, and carried away all their vehicles would hold. In the morning, the lighters were careened so much to one side that they had to be straightened up

before they could be taken back to Cheboygan to unload. In all, some 14 or 15 persons participated in this spoliation.

Conceding that libelants did not stand in the position of a common carrier with respect to these cargoes, they at least were bound to take reasonable and proper care of them, and to make good losses occasioned by the negligence of their servants. *Brind* v. *Dale*, 8 Car. & P. 207.

The defense that Knox was hired by the master of the Albany to take care of this property; that it was intrusted to him by the expressed direction of Capt. Williams, and that libelants are not chargeable for his breach of trust, is plausible, but not altogether sound. Granting that Knox had been or was in the pay of the Albany, the evidence is clear that Capt. Williams instructed Todd to take the lighters, and unload them in the Michigan Central warehouse at Cheboygan; that, failing to obtain this warehouse, libelants assumed charge of the lighters for the night, and sent them to Duncan city as a safe place for them to remain. It is scarcely necessary to say that sending them to a dock which was accessible to the public by day and night—so easy of access, indeed, that the amount of the loss was only measured by the capacity of the vehicles that were driven there to take it away—is not such care as a prudent man would take of his own property. Irrespective of the question whether Knox was in the employ of the Albany or not, we think that libelants are chargeable with gross negligence, under the circumstances, and, with the excitement then prevailing in that neighborhood, in suffering the barges to lie at a wharf open to the public, and apparently without any protection.

The case, so far as concerns the Nelson and Bob Robinson lighters, is governed by different considerations. These lighters were not owned by libelants. They had no interest in them, and no personal knowledge that they had been towed to the Albany. While there is abundant evidence of a corrupt agreement between Elliot, Robinson, and the masters of these lighters to tow them to the Albany and back for a share of their plunder, such agreement was entirely outside the scope of their agency and employment, and bound only the parties to it. It is true that Capt. Williams may have supposed that these lighters belonged to libelants, but no representation of that kind seems to have been made to him, and such was not the fact. Libelants appear to have been entirely innocent of any complicity in this entire transaction, and it is unjust that they should be held responsible for the acts of strangers, or even of their employes, when they clearly exceeded their authority. It is no part of the duty of the manager or master of a tug to permit her to be engaged in a marauding expedition of this kind, and is so far outside the scope of their employment that the owners are not bound by it.

The evidence in this case discloses a very singular misapprehension upon the part of a certain class of people with regard to the duties of the public towards vessels in distress, and with regard to the ownership of property thrown overboard or unladen from them. So far from being moved by the misfortunes of the Albany to extend to her such assistance

as was in their power, her signals of distress seemed to have been interpreted as an invitation to everybody to help himself to whatever he could lay his hands upon belonging to the cargo. Indeed there is a medieval flavor about the conduct of the men engaged in this wrecking expedition, which intuitively recalls to the student of maritime law the customs of the Gauls, as stated by Judge PETERS in his observations upon the laws of Oleron, who were in the habit of seizing upon the cargoes of vessels stranded upon their coasts, and confiscating them to the use of the lords of the soil, and of either selling their crews into slavery, or sacrificing them as an offering to their gods. Happily, the crew of the Albany were preserved from this fate, as she succeeded in extricating herself from the reef, and steaming to a port of safety.

There must be a decree for the libelants for the amount of their bill, and a decree for the cross-libelants for the value of the property taken from the tug and the first two lighters, less the amounts received in settlement and payment for the same, and a final decree for the party in whose favor a balance is found to be due. The case will be referred to a commissioner to report this amount, upon the testimony already taken and such further testimony as may be offered, within 20 days from this date.