## Case No. 11,657.

### The REESIDE.

[2 Sumn. 567.] [1]

Circuit Court, D. Massachusetts. May Term, 1837.

CONTRACTS—EVIDENCE OF CUSTOM TO EXPLAIN—BILL OF LADING—"DANGER OF THE SEAS."

1. A usage or custom will be admitted to ascertain the nature and extent of contracts, not arising from express stipulations, but from implications, presumptions, and acts of an equivocal character; or to ascertain the true meaning of particular words in a given instrument, when these words have various senses. But it will not be admitted to control, vary, or contradict a written and express contract.

[Cited in Citizens' Bank v. Nantucket Steamboat Co., Case No. 2,730; Howe v. The Lexington, Id. 6,767a; Knox v. The Ninetta, Id. 7,912; Packard v. The Louisa, Id. 10,652; Pierpont v. Fowle, Id. 11,152; Baxter v. Leland, Id. 1,124; Broadwell v. Butler, Id. 1,910; Hart v. Shaw, Id. 6,155; Garrison v. Memphis Ins. Co., 19 How. (60 U. S.) 316; Bliven v. New England Screw Co., 23 How. (64 U. S.) 432; Orient Mut. Ins. Co. v. Wright, 1 Wall. (68 U. S.) 470; Davis v. Wallace, Case No. 3,657; Dixon v. Columbus, etc., R. Co., Id. 3,929; Merchants' Nat. Bank v. State Nat. Bank, Id. 9,449; Hearn v. New England Mut. Marine Ins. Co., Id. 6,301; Balfour v. Wilkins, Id. 807; De Witt v. Berry, 134 U. S. 312, 10 Sup. Ct. 537; Devato v. 823 Barrels of Plumbago, 20 Fed. 517.]

[Cited in Barlow v. Lambert, 28 Ala. 704. Quoted in Boon v. The Belfast, 40 Ala. 184. Cited in Delaplane v. Crenshaw, 15 Grat. 464–469; Dickinson v. Gay, 7 Allen, 29; Dixon v. Dunham, 14 Ill. 327; Foye v. Leighton, 22 N. H. 76. Quoted in R. B. Gage Manuf'g Co. v. Woodward (R. I.) 23 Atl. 19. Cited in Gillis v. Bailey, 21 N. H. 158; Glendale M. Co. v. Protection Ins. Co., 21 Conn. 30, 36; Jepson v. Fraternal Alliance, 17 R. I. 471, 23 Atl. 15. Cited in dissenting opinion in Johnson v. Concord R. Co., 46 N. H. 224. Quoted in Lanfear v. Blossman, 1 La. Ann. 148. Cited in Mutual Assur. Soc. v. Scottish U. & N. Ins. Co., 84 Va. 128, 4 S. E. 182; Parsons v. Martin, 77 Mass. (11 Gray) 116; Potter v. Smith, 103 Mass. 69; Schroeder v. Schweizer Lloyd Transport-Versicherungs Gessellschaft, 60 Cal. 480; Susquehanna Fertilizer

Co. v. White, 66 Md. 455, 7 Atl. 804; Swamscot Machine Co. v. Partridge, 25 N. H. 377, 378; Sumner v. Tyson, 20 N. H. 386; Vail v. Rice, 5 N. Y. 159, 162; Ware v. Haywand Rubber Co., 3 Allen, 86; Whitmore v. South Boston Iron Co., 2 Allen, 60.]

2. Held, that evidence is not admissible to vary the common bill of lading, by which the goods were to be delivered in good order and condition, the danger of the seas only excepted, by establishing a custom, that the owners of packet vessels between New York and Boston, should be liable only for damage to goods occasioned by their own neglect.

[Cited in Stinson v. Wyman, Case No. 13,460; Weston v. Minot, Id. 17,453; The Flash, Id. 4,857; The Zenobia, Id. 18,209; Baxter v. Leland, Id. 1,124; Barstow v. Wilmot, Id. 1,066; Dupont v. Vance, 19 How. (60 U. S.) 169; Thompson v. Riggs, 5 Wall. (72 U. S.) 680; The Delaware, 14 Wall. (81 U. S.) 606; Swift v. Gifford, Case No. 13,696. Approved in The Illinois, Id. 7,005. Cited in Wood v. Phoenix Ins. Co., 1 Fed. 241; Robinson v. Memphis & C. R. Co., 9 Fed. 136; The Edwin I. Morrison, 153 U. S. 215, 14 Sup. Ct. 829; The Caledonia, 15 Sup. Ct. 541.]

[Cited in Boon v. The Belfast, 40 Ala. 184. Cited in brief in Collender v. Dinsmore, 55 N. Y. 203. Cited in Mutual Safety Ins. Co. v. Hone, 2 N. Y. 244; Van Hern v. Taylor, 7 Rob. (La.) 201.]

[See The Svend, 1 Fed. 54.]

3. Losses by "danger of the seas" are such as are of an extraordinary nature, or arise from irresistible force, which cannot be guarded against by the ordinary exertions of human skill and prudence. The mere rolling of a vessel by a cross sea is not such a danger.

[Cited in Bearse v. Ropes, Case No. 1,192; Anthony v. Aetna Ins. Co., Id. 486; The Newark, Id. 10,141; Crosby v. Grinnell, Id. 3,422; The Shand, Id. 12,702; Garrison v. Memphis Ins. Co., 19 How. (60 U. S.) 314; The Antoinetta C., Case No. 491; The Svend, 1 Fed. 61; The Titania, 19 Fed. 106; The Saratoga, 20 Fed. 872; The Nith, 36 Fed. 95.]

[Appeal from the district court of the United States for the district of Massachusetts.]

Libel on a bill of lading in rem for damages done to certain goods shipped on a voyage from New York to Boston. There was a special claim and answer; and the decree of the district court was in favor of the libellants [case unreported]; from which the claimants [Gilman Stanley and another] appealed to the circuit court.

The libel in substance stated, that the goods in question, nine bales of carpeting and one box of binding, were shipped in good order and condition on the 15th of August, 1836, on board the schooner Reeside, owned by the respondents, and of which one Mayo was then master, bound from New York to Boston, and were "to be delivered in the like good order and condition at the port of Boston, the danger of the seas only excepted, unto Fowle & Brewer (the libellants), or to their assigns, he or they paying freight for the same nine bales and one box." The gravamen alleged in the libel was, that the bales of carpeting were greatly damaged and injured by absorbing a great quantity of oil, which leaked from a large number of casks of oil, near which the carpeting was improper-

[1] [Reported by Charles Sumner, Esq.]

ly stowed, and not by the perils of the seas. The answer, after contesting negatively the allegations of the libel, as to the cause of loss, except as to one bale of the carpeting, for the damage to which the respondents admitted their liability, and after affirming, that the loss sustained was by the perils of the seas. and by the extraordinary rolling of the schooner during the voyage, by reason of high winds, proceeded in the fourth article to assert, that there was an established usage or custom of the packet vessels, engaged in trade between New York and Boston, "that the ship owners should see the merchandise, committed to them, properly secured and stowed, and, that being done, the ship owners should not be liable to pay for any damage not occasioned by their neglect;" and afterwards insisted upon the benefit of this usage or custom, as exempting them from liability in this case, except for the one bale above referred to. An exception was taken to this article, as being incompetent in point of law to be admitted to proof. This exception was argued separately, before proceeding to consider the merits of the case.

C. P. & B. R. Curtis, for libellants.

P. Sprague and W. Gray, for respondents.

STORY, Circuit Justice. I own myself no friend to the almost indiscriminate habit of late years, of setting up particular usages or customs in almost all kinds of business and trade, to control, vary, or annul the general liabilities of parties under the common law, It has long appeared to me, that there is no small danger in admitting such loose and inconclusive usages and customs, often unknown to particular parties, and always liable to great misunderstandings and misinterpretations and abuses, to outweigh the well-known and well-settled principles of law. And I rejoice to find, that, of late years, the courts of law, both in England and in America, have been disposed to narrow the limits of the operation of such usages and customs, and to discountenance any further extension of them. The true and appropriate office of a usage or custom is, to interpret the otherwise indeterminable intentions of parties, and to ascertain the nature and extent of their contracts, arising not from express stipulations. but from mere implications and presumptions, and acts of a doubtful or equivocal character. It may also be admitted to ascertain the true meaning of a particular word, or of particular words in a given instrument, when the word or words have various senses, some common, some qualified, and some technical, according to the subject-matter, to which they are applied. But I apprehend, that it can never be proper to resort to any usage or custom to control or vary the positive stipulations in a written contract, and, à fortiori, not in order to contradict them. An express contract of the parties is always admissible to supersede, or vary, or control, a usage or custom; for the latter may always be waived at the will of the parties. But a written and express contract cannot be controlled, or varied, or contradicted by a usage or custom; for that would not only be to admit parol evidence to control, vary, or contradict written contracts; but it would be to allow mere presumptions and implications, properly arising in the absence of any positive expressions of intention, to control, vary, or contradict the most formal and deliberate written declarations of the parties.

Now, what is the object of the present asserted usage or custom? It is to show, that, notwithstanding there is a written contract (the bill of lading), by which the owners have agreed to deliver the goods, shipped in good order and condition, at Boston, the danger of the seas only excepted; yet the owners are not to be held bound to deliver them in good order and condition, although the danger of the seas has not caused or occasioned their being in bad condition, but causes wholly foreign to such a peril. In short, the object is, to substitute for the express terms of the bill of lading an implied agreement on the part of the owners, that they shall not be bound to deliver the goods in good order or condition; but that they shall be liable only for damage done to the goods occasioned by their own neglect. It appears to me, that this is to supersede the positive agreement of the parties; and not to construe it. The exception must, therefore, be sustained.

At a subsequent day the cause came on to be heard upon the depositions and other proofs. The important facts are embodied in the opinion of the court.

STORY, Circuit Justice. The only remaining question, then, is whether the damage to the goods in this case has been occasioned by the danger of the seas, for there is no dispute as to the fact of the actual damage. I am not satisfied, that there was any bad stowage in this case; though it does appear to me, that, considering the nature of the principal cargo (two hundred barrels of oil,) it would have been very fit and proper to have stowed the carpeting in a more prudent manner, in some other part of the vessel. I cannot attribute the damage in this case to any danger of the seas. It seems to me, that the weather was not worse than what must ordinarily be expected to be encountered in such a voyage; and the rolling of the vessel by a cross sea is an ordinary incident to every voyage upon the sea. The phrase "danger of the seas," whether understood in its most limited sense, as importing only a loss by the natural accidents peculiar to that element; or whether understood in its more extended sense, as including inevitable accidents upon that element, must still, in either case, be clearly understood to include only such losses

as are of an extraordinary nature, or arise from some irrestible force, or some overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence. See Story, Bailm. §§ 512-525; 2 Marsh. Ins. pp. 487, 492, c. 12, § 1; Abb. Shipp. pt. 3, c. 4, § 1; 3 Kent, Comm. (3d. Ed.) p. 216, lect. 47; Id. 217; Eliot v. Rossell, 10 Johns. 1. It is scarcely necessary to do more upon such a subject than to refer to the cases collected on this head by Lord Tenterden in his treatise on Shipping (Abb. Shipp. pt. 3, c. 4, §§ 1–8) and by Mr. Chancellor Kent in his learned Commentaries (3 Kent, Comm., 3d Ed., pp. 299, 300, and note; Id. 216, 217).

There is no evidence in the present case, which satisfies my mind, that, if the oil had been properly coopered and properly stored, the rolling of the vessel in the manner stated would have produced any such damage, as occurred in this case. It is remarkable, that none of the witnesses, who have been accustomed to carry oil on similar voyages, speak of any damage having occurred under like circumstances from the mere rolling of the vessel in a cross sea, or indeed of any damage at all. But the evidence does establish to my mind most conclusively, that the casks of oil were in very bad order, and very improperly coopered, when they were shipped; and that the whole damage was occasioned by the uncommon leakage from the casks, arising from their bad condition when shipped. If the casks had been shipped in proper order, it is incredible, that the leakage should have been so extraordinary, especially when it abundantly appears, that the rolling of the vessel was for a short time, and did not start any of the casks from their original position. The appearance of the casks, upon their being landed at Boston, struck one of the most favorable of the respondent's witnesses (Capt. Nichols) with great surprise, and produced an inquiry on his part, whether they were in good order, when taken on board. To which the reply of the mate was, that they were. But Capt. Nichols said, that the hoops were loose, more than usual, and that he does not know, whether they were properly coopered or not. It is true, that the New York witnesses, who did the work under the principal cooper in that port, express a positive opinion, that the casks, when shipped, were well coopered and in good order; and that they did all the necessary cooperage. But though they are competent witnesses, it is impossible to wink out of sight, that they stand in a position somewhat peculiar, and under influences not wholly without a bearing upon the cause. They come to purge themselves and their employer from the imputation of gross neglect in the discharge of duty. On the other hand the Boston witnesses are in an entirely different predicament, and disconnected from all influences, which can fairly be supposed to disturb their judgment. They also speak, not to matters of opinion merely, but to facts also. They not only declare, in the most unequivocal terms, that the casks were in very bad order, when they were unladen in Boston; and that they did not, with the exception of three or four, bear any marks of having been recently coopered, and that, in their judgment, they had not from their appearance been recently coopered, but were a lot long put up; but they state the fact, that they were obliged to cooper a large number of them, when unladen, on account of their bad leaking at the time. Indeed, the leakage was so great, that out of one lot of fifty casks belonging to Mr. Brown (one of the shippers,) he stated, that one hundred and thirty-four gallons and a half of oil had actually leaked out during this very short voyage; and the whole testimony shows, that the vessel was not even subjected to a heavy cross sea for more than an hour or two. If, indeed, under the circumstances testified to, the rolling of the vessel from the cross sea could have occasioned so much leakage, it would be difficult to satisfy my mind that there was not grossly improper stowage; for it would be impossible to treat it as a peril of the sea, which could not have been avoided by the ordinary exercise of human prudence and skill.

There is a most significant circumstance in the evidence, established, as I think, beyond all reasonable controversy, which shows, that Capt. Mayo, the master of the Reeside, took the same view of this matter, recenti facto. It seems, that Mr. Brown had procured insurance on his shipment of oil; and finding, on the arrival, that the oil was in such very bad order, and that there had been such an extraordinary leakage, he applied to Capt. Mayo to ascertain, what had been the weather during the voyage, so as to know, whether he might claim the loss from the underwriters, as arising from the perils of the seas. Capt. Mayo, with a knowledge of his object, so far from encouraging any hope of this sort, explicitly stated, "that he had had a very good passage, and a blow only for an hour or two." Mr. Ellison (a clerk in the store of the libellants), has given a statement, which entirely corroborates that of Mr. Brown, if indeed it should be thought to require (as I do not think it does) any corroboration. He also had a conversation with Capt. Mayo respecting the damage done to the carpeting, and said to him, that it could not have arisen from the perils of the sea, because there had been good weather; to which Capt. Mayo assented, as he did to the additional statement by the witness, that, if the libellants had been insured, they could not have recovered of the underwriters. Capt. Mayo then added, "that if the port warden gave them a certificate, that the goods were properly stowed, they were not liable to pay for damages; otherwise they were."

There is another fact, which I cannot but think, adds no inconsiderable strength to the case for the libellants. It is, that the

carpeting was folded and pressed by a power press in the bales in so close a manner, that unless the leakage was to a very extraordinary extent, the oil never could have penetrated farther than through the external folds or than through the mere edges of the bales; whereas in fact it penetrated or was absorbed through the edges of every successive fold of the carpeting (the bales of carpeting being stowed on their ends) to the depth of from six to eighteen inches. This circumstance demonstrates, not only, that the leakage was very great, but, that the carpeting was exposed to the action of the oil for a considerable length of time.

Upon the whole, after examining the testimony, I am fully satisfied, that the injury did not arise from the dangers of the seas, properly so called, but from the oil not being properly coopered and shipped in good order; and, therefore, the libellants have maintained their libel; and the decree of the district court ought to be affirmed with costs. It has been suggested, that this case is of great importance to the packet ship interest. It may be so. But in my opinion it is quite as important to the shipping interest. And if packet owners could, under circumstances like the present, escape from responsibility for like losses, it would be in the highest degree mischievous to the best interests of trade and navigation. No honorable merchant, tolerably attentive to his own interest, ought to be willing to risk his goods upon any voyage, unless he can have some adequate security against losses of so serious a nature. It would be to hold out to packet masters a premium for indifference, or carelessness, or want of vigilance in protecting the shipments confided to their care. I cannot but deem every relaxation of the common law in relation to the duties and responsibilities of the owners of carrier ships to be founded in bad policy, and detrimental to the general interests of commerce.

The decree of the district court is affirmed, with costs.