### THE JAMES BAIRD.

#### COTTINGHAM v. ABBOTT et al.

(District Court, D. Massachusetts. December 6, 1898.)

No. 834.

1. SHIPPING—RATE OF DISCHARGING CARGO—CONSTRUCTION OF CHARTER PARTY.
   A charter party for a vessel to be loaded with lumber provided that "the lay days for loading or discharging shall be as follows (if not sooner dispatch), commencing one clear day from the time the captain reports his vessel ready to receive or discharge cargo: * * * Loading with all possible dispatch, but not less than 25 M. feet daily. * * * The cargo or cargoes to be * * * delivered according to custom of the port of discharge." *Held*,

that such contract did not expressly provide for the rate of discharge at 25 M. feet daily.

2. SAME—CUSTOM OF PORT. .

A custom of a port as to the rate of discharging a certain kind of lumber from a vessel, to govern the rights of parties under a contract otherwise indeterminate, must not only be established and reasonable, but also certain and definite. Such a custom cannot be found on testimony that the rate is "from 17,000 to 20,000" feet per day, or "from 25,000 to 30,000" feet. Such testimony can only establish the usual or average time for unloading, and is valuable only as showing the limits, under ordinary circumstances, of a reasonable rate of discharging lumber of that kind at such port, and does not obviate the necessity of considering the particular circumstances of each case.

3. SAME—INCONVENIENCE OF WHARF—LIABILITY OF CONSIGNEE FOR DELAY.

Where the wharves at a port are not all equally convenient for the discharge of every sort of cargo, in the absence of a custom establishing a uniform rate, a reasonable rate of discharge is not necessarily the same at all wharves, and, while a wharf may be so inconvenient as to render the consignee responsible for the delay in discharging thereat, the reasonable convenience required is not the highest degree of convenience either imaginable or actually existing.

This was a libel in admiralty for demurrage on account of delay of the respondents, as consignees, in discharging a cargo.

Carver & Blodgett, for libelant.

John Lowell, for respondents.

LOWELL, District Judge. The libelant in this case is the owner of the schooner James Baird, upon which a cargo of hard pine timber and flooring was shipped from Pascagoula, Miss., to Boston, consigned to the respondents. The material parts of the charter party are as follows:

"A full and complete cargo of kiln-dried and resawn pitch pine lumber under and on deck. Cargo to be all kiln-dried lumber under deck. It is agreed that the lay days for loading or discharging shall be as follows (if not sooner dispatch), commencing one clear day from the time the captain reports his vessel ready to receive or discharge cargo at such safe anchorage as the charterer may direct: Loading with all possible dispatch, but not less than 25 M. feet daily, Sundays excepted; and that, for each and every day's detention by default of said party of the second part or agent, thirty-seven & °⁰/₁₀₀ dollars per day shall be paid by said party of the second part or agent to said party of the first part or agent. The cargo or cargoes to be received alongside, within reach of vessel's tackles, and delivered according to custom of the port of discharge."

The material parts of the two bills of lading are as follows:

"(1) Shipped in good order and well conditioned:

"32,945 pcs. rough kiln-dried lumber, containing 260,863 feet.

"9,313 pcs. dress kiln-dried lumber, containing 40,342 feet.

"About 99,378 feet of the above lumber is on deck.

"(2) 4,612 pcs. 4¼x4 rift. flg., containing 35,560 feet.

"16 pcs. resawn lumber, containing 14,526 feet.

"About 32,000 feet of the above lumber is on deck."

The captain duly reported his arrival on May 21, 1896, about 5 p. m., and was directed to Mystic Wharf. The "resawn lumber," or timber, all of which was on deck, was there discharged into the water at a time which I am not able to determine precisely from the evidence, but, at the latest, before the noon of May 25th. Otherwise no berth was provided and no cargo was discharged until May 26th, when a berth was provided, but, as the day was rainy, the discharge did not begin until May 27th.

It continued upon every week day through June 3d, when the discharge of the deck load was completed. On June 4th the Baird was moved to a dock owned by the respondents, but could not come close alongside it, owing to want of water, until a part of the cargo below deck had been taken off over a temporary bridge. This occupied two or three days, after which the Baird, being lightened, was hauled up to the dock. Thereafter it is admitted that the discharge was sufficiently prompt.

The libelant contended in argument that the charter party provided expressly for a discharge at the rate of 25 M. per day, but in this I think he is mistaken, and that the express agreement relates only to the rate of loading, although a rate of loading, stipulated by the parties, may, in some cases, be evidence of what is a reasonable rate of discharge. The libelant further alleged a custom of the port of Boston fixing 25.000 feet per day as a reasonable rate for the discharge of this kind of flooring, while the respondents alleged an established custom of less than 20,000.

The evidence on both sides satisfies me abundantly that no customary rate, properly so called, exists for the discharge of this kind of lumber. The appropriate office of a custom is to interpret the otherwise indeterminate intentions of the parties or to ascertain the true meaning of a particular word. See The Reeside, 2 Sumn. 567, Fed. Cas. No. 11,657. To be valid, a custom must be not only established and reasonable, but certain and definite. One of the libelant's witnesses, for example, testified that the custom calls for a discharge of 25,000 to 30,000 feet; one of the respondents' witnesses, in like manner, testified to a customary rate of 17,000 to 20,000. I do not think either custom is possible. There might be a definite rate of discharging lumber fixed by custom for the sake of convenience, as 100 tons a day, Sundays excepted, is said to be the customary rate for the discharge of coal. See Thacher v. Gas-Light Co., 2 Low. 361, 364, Fed. Cas. No. 13,850. A custom which fixes the rate at from 17.000 to 20,000 feet, however, is an impossibility, unless the minimum is the privilege of one party and the maximum that of the other, or unless the custom defines the circumstances under which every rate between the maximum and minimum becomes customary. Neither condition exists here, and the meaning attached to the words "custom" and "customary" is well defined by the witness Childs:

"The point has been raised here on the words 'customary,' 'average,' 'usual.' The way that I look at the three words is that they are practically one word. 'Customary' means the average or usual dispatch at the port at which the vessel discharges. That is the term that is used among the brokers and the merchants in every port where the vessels go. The word 'customary' is considered to mean what is the average or usual time for unloading at that port."

The testimony given on both sides is therefore valuable only as it shows what are the limits, under ordinary circumstances, of a reasonable rate of discharge of this kind of lumber within the port of Boston. It does not establish a definite rate, or obviate the necessity of considering the circumstances of each case.

The charter party in this case gave the respondents "one clear day" in which to provide a berth for the schooner. I need not here determine precisely what these words mean under all circumstances. In this case they bound the respondents to furnish a berth where the Baird

could discharge throughout the whole of May 23d. In fact, no berth was furnished until May 26th, and the libelant lost the use of May 23d and May 25th, except so far as he employed them in discharging the timber, something less than half a day's work. It is practically admitted that no discharge is to be expected on Sundays and holidays, and, so far as kiln-dried lumber under deck is concerned, I think it is fairly established that no discharge is to be expected on rainy days. I hesitate to apply this exception to a deck load, even of kiln-dried flooring, which has been carried from Pascagoula to Boston; but as there is no evidence whether the failure to discharge on May 26th was caused by the stevedore or by the consignee, and as no one is shown to have asked for discharge on that day, I shall allow no demurrage for it. Discharge was continued on every other week day that the schooner lay at Mystic Wharf, including May 30th. Presumably it was permitted on that day for the convenience of both parties, and the discharge upon a holiday leaves the case as if the schooner had so much less cargo to discharge on her stipulated lay days.

The libelant contends that the discharge was hindered at Mystic Wharf by its inconvenient arrangement and management, and by the inability of the surveyor properly to keep up with the stevedore. The evidence to this effect is not very definite. That Mystic Wharf is somewhat less convenient than other wharves in Boston appears pretty plainly, and the rate of discharge thereat seems to be somewhat lower than at some other wharves. I am not convinced, however, either by the evidence or by the argument, that a reasonable rate of discharge is necessarily the same at all wharves and under all circumstances. The wharves in Boston are not, in fact, equally convenient for the discharge of every sort of cargo, and no custom has been proved which requires me to disregard the difference among them. Doubtless a wharf may be so inconveniently arranged or constructed that the consignee will be responsible for the delay in discharging thereat, but the reasonable convenience required of a wharf is not the same thing as the highest degree of convenience either imaginable or actually existing. Taking everything together, I think that the libelant was improperly delayed at Mystic Wharf somewhat, but not very much. I allow a day and a half before discharge began and one day thereafter.

The removal to the respondents' wharf was by the orders of the respondents, and for the delay caused thereby they are responsible. The evidence does not show distinctly how much delay was caused by the moving and by the inability to bring the vessel immediately alongside. Evidently it was small, and I shall allow only an additional half day's demurrage therefor. The vessel having been thus delayed three working days by the fault of the respondents, it follows that she ought to have finished her discharge by June 12th instead of June 16th, and there must be a decree for four days' demurrage, as one Sunday intervened. To recapitulate, I think the Baird should have been discharged on May 23d, 25th, 27th, 28th, 29th, 30th (by the assent of both parties), June 1st, 2d, 3d, 4th, 5th, 6th, 9th, 11th, 12th. May 24th and 31st and June 7th were Sundays. On May 26th and June 8th and 10th it rained.

Decree accordingly.