## CHILBERG v. LYNG.

(Circuit Court of Appeals, Ninth Circuit. February 8, 1904.)

### No. 976.

1. BROKERS—SALE OF MINES—SUBAGENTS—EMPLOYMENT—CUSTOMS—KNOWLEDGE.

A general custom in a certain city for brokers intrusted with the sale of mining properties to employ subagents to assist in securing purchasers, and to allow them commissions out of the purchase price for their services, is not binding on the owner of mining claims left with a broker for sale, in the absence of proof of the owner's knowledge thereof.

2. SAME—CONTRADICTING WRITTEN CONTRACT.

Where a broker engaged to sell certain mines agreed to effect the sale for a commission of 5 per cent., evidence of a custom of brokers to employ subagents to assist in the sale, and to allow them a commission out of the purchase price for a sale affected, was inadmissible, as tending to vary the unambiguous agreement of the parties.

3. SAME—VALIDITY OF CUSTOM—PUBLIC POLICY—FRAUD.

A custom of brokers in a certain city to employ subagents to assist in securing purchasers for mining claims, and to allow them commissions out of the purchase price for their services, ordinarily secured by raising the price of the property, was contrary to public policy, as directly leading to fraud and questionable practices.

In Error to the District Court of the United States for the Second Division of the District of Alaska.

W. V. Rinehart, Jr., and Ballinger, Ronald & Battle (J. J. Kennedy, of counsel), for plaintiff in error.

Page, McCutchen & Knight, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. This was an action at law brought by the defendant in error in the court below to recover of the plaintiff in error certain moneys received by him as the agent of the plaintiff below and of his assignor, one Dexter, on the sale of certain mining claims situated in Alaska, and belonging to Lyng and Dexter, respectively. The case shows that Lyng, acting for himself and Dexter, employed the plaintiff in error, Chilberg, who resided at Seattle, Wash., to sell these claims, agreeing to take $2,000 cash on each claim, and a balance of $23,000 for Lyng's claim, and $28,000 for Dexter's claim by September 15, 1900; "the claims to be worked by the buyers the whole season or

¶ 1. See Customs and Usages, vol. 15, Cent. Dig. §§ 23, 24.

until Sept. 15th, the owners to get one-half or will take one-third of all gold.taken out up to that time"; Chilberg to receive for his services in that behalf a commission of 5 per centum. The latter effected a sale of the two claims to a Mr. Strout, acting for a Mr. Fleitmann, of New York, and was so prompt in remitting (in part) that he tele-graphed Lyng from Seattle to San Francisco $3,770.70, which was $2,000 on each claim, less his commission of 5 per centum, amounting to $200, attorney's fee for drawing papers, $15, and cost of telegrams, $14.30. This was followed by a letter from the plaintiff in error reading as follows:

"Seattle, Wash., May 14, 1900.

"Mr. R. T. Lyng, Room 14, Mills Building, San Francisco, Cal.—Dear Sir: I have to-day wired you through the Crocker-Woolworth National Bank $3,770.70 covering amount accruing to you from sale of Nos. 4 and 5 Below on Anvil Creek as consummated by me. You will note that the total cash consideration reads $7,500.00, $3,500 of this was a confidential commission to parties who brought the trade about, and it is important that nothing be said about it so it can reach Mr. Strout in Alaska or Mr. Fleitmann in New York.

"If it should become public, it would probably spoil the balance of the trade. As this sort of a scheme was one on which I succeeded in raising the price to come out of the ground $7,000.00 on each claim so I think you should be very well pleased with the whole trade.

"Mr. Fleitmann of New York for whom Mr. Strout is acting is several times over a millionaire, and able and willing to work the claims out if they show prospects, if it requires $100,000.00 to do it, and from what I can learn these will be costly mines to work. It has been hard work to keep the sale open until the last papers arrived, and the 'Knockers' almost spoiled it twice.

"I hope you will be satisfied with the trade, and will expect the balance of my commission as the money is paid over to you.

"You will note that the quitclaim deeds are placed in escrow with the Alaska Banking and Safe Deposit Co., of Nome, who are the correspondents of our bank here, which I trust will be satisfactory to you. You will note also that I have provided that you receive one-half of all the gold taken out instead of one-third if they do not complete the purchase. I have used every endeavor to promote your interest in this matter, and feel highly gratified that it is consummated. I trust that you will observe the caution I have requested as to the $3,500.00 as it would seriously harm friends of mine, and be detrimental to your chance of completing the deal.

"Enclosed find agreements, also location notice of your No. 4 which I return to you as requested. I also enclose the first power of attorney, which you sent me, and which was not used.

"With kindest regards, I remain, Very truly yours,

"Eugene Chilberg."

The purchaser of the claims subsequently, and prior to Dexter's assignment of his interests to Lyng, paid to Dexter $8,750 of the deferred payment, 5 per centum of which the latter paid over to the plaintiff in error, Chilberg, and also paid to Lyng a like sum of $8,750 on the deferred payment due on the claim sold by him, the defendant's commission on which Lyng had not paid at the time of bringing this action. Dexter having thereafter assigned to Lyng all of his rights in the premises, the latter brought the present action to recover of the agent, Chilberg, that portion of the cash payment made by the purchaser on the two claims which the defendant, Chilberg, failed to pay over to the owners of the claims, with interest and costs.

In his answer to the complaint the defendant, Chilberg, denied that

he received as cash payment on the sale of either of the claims in question any other or greater sum than $2,000, and also set up in defense—

"That it was then, is now, and at all times herein mentioned has been, a general custom, usage, and practice in the city of Seattle for agents intrusted with the sale of mining properties to employ subagents and brokers to assist in securing purchasers for such properties, and to allow them commissions out of the purchase price for their services. That defendant followed said general custom, usage, and practice, and employed a broker to assist in securing a purchaser for said claims, and agreed with said broker that he should have, of the first cash payment which he might secure from any purchaser, all thereof over and above the amount fixed by the plaintiff as such cash payment, all of which was by the defendant promptly reported to the plaintiff, and he made no objection thereto."

On the trial it was clearly proved, and not disputed, that the defendant did in fact receive from the purchaser $3,750 in cash on each claim, for only $2,000 of which did he account to the owner of the property. The defendant claimed, and so the testimony showed, that he employed his cousin, one J. E. Chilberg, to assist him in effecting a sale of the property, to whom he turned over $3,500 of the cash paid by the purchaser. There was no evidence tending to show that either the plaintiff or his assignor, Dexter, knew of any such arrangement between the defendant, Chilberg, and his cousin, or ever authorized any such arrangement, or ever varied the agreement by which the defendant, Chilberg, was employed as the agent of Lyng and Dexter to sell the claims for an agreed commission of 5 per centum on the amount of sale. Not only did the evidence fail to show any knowledge on the part of the plaintiff or of Dexter of any such custom as was alleged by the defendant, but at one stage of the trial, when the defendant was endeavoring to prove that the alleged custom prevailed in Seattle, the court propounded to one of the attorneys for the defendant this inquiry, which was answered as follows:

"The Court: I would inquire just at this stage, Mr. Rinehart, do you intend to show knowledge or impute knowledge to Mr. Lyng—express knowledge, knowledge of this usage, if there be such usage? Mr. Rinehart: To be fair with the court, I cannot promise to prove express knowledge—Mr. Lyng having testified that he did not know of such a usage—but I think I can show facts which will charge him with knowledge, and would justify the jury in believing that he did have knowledge, and that he dealt with that knowledge in view."

Nothing was given in evidence tending to show any such knowledge on the part of the plaintiff or Dexter. The court below rightly excluded proof of any such custom on that ground. But no such custom, if it existed, could avail the defendant, for the reason, first, that it would be inadmissible to thus vary the unambiguous agreement of the parties (Thompson v. Riggs, 5 Wall. 663, 18 L. Ed. 704; Schooner Reeside, 2 Sumn. 567, Fed. Cas. No. 11,657; Keller v. Meyer, 74 Mo. App. 318; Davis v. New York S. S. Co. [Sup.] 54 N. Y. Supp. 78; Jefferson v. Burhans, 85 Fed. 949, 29 C. C. A. 481); and, secondly, such custom, if it existed, would be against public policy, as directly tending to lead to fraud and questionable practices. No better illustration of this fact is needed than that afforded by the letter of the

defendant written to the plaintiff after the completion of the transaction in question, where he said:

"You will note that the total cash consideration reads $7,500. $3,500 of this was a confidential commission to parties who brought the trade about, and it is important that nothing be said about it so it can reach Mr. Strout in Alaska or Mr. Fleitmann in New York. If it should become public, it would probably spoil the balance of the trade. As this sort of a scheme was one on which I succeeded in raising the price to come out of the ground $7,000 on each claim, so I think you should be very well pleased with the whole trade. Mr. Fleitmann of New York, for whom Mr. Strout is acting, is several times over a millionaire, and able and willing to work the claims out if they show prospects, if it requires $100,000 to do it, and from what I can learn, these will be costly mines to work. It has been hard work to keep the sale open until the last papers arrived, and the 'Knockers' almost spoiled it twice. * * * I trust that you will observe the caution I have requested as to the $3,500, as it would seriously harm friends of mine, and be detrimental to your chance of completing the deal. * * *"

See De Bussche v. Alt, 8 L. R. Ch. Div. 286; Geyser-Marion G. M. Co. v. Stark, 106 Fed. 558, 45 C. C. A. 467, 53 L. R. A. 684; Day v. Holmes, 103 Mass. 306; Dodd v. Farlow, 11 Allen, 426, 87 Am. Dec. 726; Hopper v. Sage (N. Y.) 20 N. E. 350, 8 Am. St. Rep. 771; Smith v. Clews (N. Y.) 21 N. E. 160, 4 L. R. A. 392, 11 Am. St. Rep. 627.

The court below properly instructed the jury to render a verdict for the plaintiff, less 5 per centum commission on the $8,750 which was subsequently paid to him by the purchaser, to which the defendant was entitled under the contract between the parties.

The judgment is affirmed.